This matter comes before the Court upon the petition of the Pennsylvania Labor Relations Board for a decree enforcing the final order of the Board heretofore entered in the above entitled proceedings.
In its decision and order, the Board has found certain of the respondents guilty of unfair labor practices within the meaning of Section 6, subsection 2, clauses (d) and (D) of the "Pennsylvania Labor Relations Act", as amended (Act of June 1, 1937, P. L. 1168, 43 PS 211.1, et seq.): (1) in picketing or causing to be picketed a place of employment by persons who were not employes of the place of employment; and (2) in combining or *Page 248 
conspiring to hinder or prevent the obtaining, use or disposition of materials, equipment or services.
The first of these findings is based on an amendment to Section 6 of the Act, enacted June 30, 1947, effective September 1, 1947. The second finding is based on another amendment to Section 6 of the Act, enacted July 7, 1947, effective immediately upon enactment. Neither of the amendments referred to the other, and both were designated as clause "d" of subsection 2. To distinguish these clauses, it seems to have been the custom in other cases to refer to the June amendment as "d", and the July amendment as "D".
A charge against certain of the respondents was filed with the Board on July 22, 1947, by Hardy D. Wilbank and Eleanor M. Wilbank, his wife, trading as Imperial Hotel and Cafe. A complaint issued July 29, 1947, alleging the commission of unfair labor practices under both of the 1947 amendments, notwithstanding the fact that the June amendment did not become effective until September 1, 1947. Another charge against certain of the respondents (not identical with the respondents named in the first charge) was filed with the Board on September 3, 1947, by the same complainants. Another complaint issued September 3, 1947, alleging the commission of unfair labor practices under the June amendment. On September 3, 1947, the Board entered an order directing that the hearings in the two cases be "heard and conducted jointly." Hearings were held before a Trial Examiner designated for the purpose. At the hearing, counsel for the complainants was permitted to withdraw paragraphs (5) and (6) of the earlier complaint alleging the commission of unfair labor practices under the June amendment. The testimony taken before the Trial Examiner was transcribed and filed with the Board, but the Board made its own findings and entered a Nisi Decision and Order, which, after hearing on the *Page 249 
exceptions filed by the respondents, was made final and absolute, one member of the Board dissenting.
The Board's Nisi Order of November 6, 1947, made final on March 29, 1948, was as follows:
"The Pennsylvania Labor Relations Board, therefore, after due consideration of the foregoing and the record as a whole, hereby orders and directs: that Chester and Delaware Counties Bartenders, Hotel Restaurant Employes Union, Local No. 677, and Rocco Locantore, Charles Inman, William Nuttall, George McMahon and Edwin Longley shall:
1. Cease and desist from in any manner picketing or causing to be picketed the place of employment maintained and operated by Hardy D. Wilbank and Eleanor M. Wilbank, his wife, trading and doing business as Imperial Hotel and Cafe, at 7th and Welsh Streets, in the City of Chester, County of Delaware, Commonwealth of Pennsylvania.
2. Cease and desist from combining to hinder and prevent in any manner the complainants, Hardy D. Wilbank and Eleanor M. Wilbank, his wife, trading and doing business as Imperial Hotel and Cafe, at 7th and Welsh Streets, in the City of Chester, County of Delaware, Commonwealth of Pennsylvania, from obtaining materials and supplies used in the operation of said business.
3. Take the following affirmative action which the Board finds will effectuate the policies of the Pennsylvania Labor Relations Act:
(A) Remove all pickets and signs from the place of employment operated and maintained by Hardy D. Wilbank and Eleanor M. Wilbank, his wife, trading and doing business as Imperial Hotel and Cafe.
(B) Furnish satisfactory evidence to the Pennsylvania Labor Relations Board by affidavit or affidavits of compliance, with this decision and order, within 20 days from the effective date hereof. *Page 250 
And it is hereby further ordered and decreed that in the absence of any exceptions filed within ten days from the date hereof, this decision and order shall become and be absolute, as of course."
Findings of the Board on which an order is based, must be supported by substantial and legally credible evidence. 43 PS 211.9 (b). If they are so supported, the findings are binding and conclusive upon review.
We have no doubt, after a careful review of the record, that the ultimate findings of the Board in this case are amply supported by the evidence. We do not understand that the respondents seriously contend to the contrary, although their position is not altogether clear on this point. In their answer to the Board's petition for enforcement, the respondents say that "The picketing of the Imperial Hotel by the Respondents was ceased when enjoined by the Delaware County Court of Common Pleas." (The decree of the Court enjoining the picketing was affirmed by the Supreme Court on July 6, 1948, after respondents filed their answer to the Board's petition for enforcement in these proceedings. See Wilbank v. Bartenders,etc., Union, 360 Pa. 48. These equity proceedings, and their relation to the present litigation, will be discussed at the proper place.) Respondents' real challenge to the Board's action is based on the contention that both of the 1947 amendments to the Labor Relations Act are unconstitutional, in that they transgress the limits within which the Fourteenth Amendment of the United States Constitution confines State power. They say they have not complied with the Nisi Order of the Board of November 6, 1947, because the clauses (d) and (D), added by the 1947 amendments, "are unconstitutional in that they constitute an abridgement of freedom of speech and freedom of assembly." Respondents raised the issue of constitutionality both in their answers to the complaints, and at the hearing before the Trial Examiner. *Page 251 
There is little dispute with respect to the basic and underlying facts insofar as they are material to the present issue. Summarizing the Board's findings of fact, the following history appears:
During the year 1947, Hardy D. Wilbank and Eleanor M. Wilbank, his wife, were engaged in a general hotel and restaurant business at Seventh and Welsh Streets, in the City of Chester, this County, under the name, "Imperial Hotel and Cafe." In the conduct of their said business, Mr. and Mrs. Wilbank employed fourteen persons, who served as bartenders, waitresses, chef, dishwashers, maids, desk clerk, secretary and night watchman. None of these employes were members of the respondent, Chester Delaware Counties Bartenders, Hotel 
Restaurant Employes Union, Local No. 677 (hereinafter called "Local No. 677"), nor, it appears, of any other labor organization. During the period of time here material, there was no labor dispute or controversy between Mr. and Mrs. Wilbank and any of their employes. In or about March or April of 1947, respondent Rocco Locantore, business representative of Local No. 677, presented Mr. Wilbank with a printed form of contract in which the Local Joint Executive Board of Philadelphia, another of the respondents, was referred to as the "Union" comprising certain designated local unions, among which was Local No. 677, and requested Mr. Wilbank to read it over and then sign it. Mr. Wilbank stated that he would read the contract over and study it, and that Mr. Locantore could return later and he would give him his decision. The Board made a finding, on sufficient evidence, that "on June 12, 1947, Hardy D. Wilbank received a telephone call from Rocco Locantore, who inquired if he intended to sign the contract, and upon being informed that he did not intend to sign the contract at that time, Rocco Locantore replied 'There'll be pickets in front of the hotel tomorrow morning.' " *Page 252 
On June 13, 1947, Local No. 677 established a picket line at the Imperial Hotel and Cafe, and the picket line continued without interruption until at least September 22, 1947. Charles Inman, William Nuttall, George McMahon and Edwin Longley, of the respondents, were members of Local No. 677, and from time to time during the period from June 13, 1947 until at least September 22, 1947, actively participated in the picketing. Rocco Locantore also engaged in the picketing. None of these men were at any time employes of the Imperial Hotel and Cafe. From the beginning of the picketing until about August 1, 1947, the pickets carried signs bearing the legend: "Imperial Hotel and Bar, This Is A Non-Union House. We Earnestly Request Our Friends Sympathizers not to patronize. Hotel and Restaurant Employees and Bartenders International Union, Affiliated with A. F. of L." From about August 1, 1947, until September 2, 1947, the signs read: "Imperial Hotel and Bar is Non-Union, Philadelphia Local Joint Board, A. F. of L." From about September 2, 1947, until at least September 22, 1947, the signs read: "Imperial Hotel and Bar. This is a Non-Union House. Local Joint Board, Hotel Restaurant Employees Bartenders International Union, Affiliated with A. F. of L." These signs were carried by the pickets daily from June 13, 1947, until at least September 22, 1947, except on holidays and Sundays. During the course of the picketing, one of the respondents and picketers approached employes of the complainants' suppliers, who were about to deliver supplies to the complainants' premises, and requested them not to make the deliveries. The deliveries were not made.
Prior to June 13, 1947, deliveries were made to the Imperial Hotel and Cafe of all supplies, commodities, merchandise and edibles necessary for and incidental to the complainants' business. After that date, various of *Page 253 
complainants' suppliers refused to make further deliveries because of the presence of the picket line.
It is necessary to add, perhaps, that the Board found that Local No. 677 is a "labor organization" within the meaning of Section 3, subsection (f), of the Labor Relations Act; that the picketing at the Imperial Hotel and Cafe was ordered, authorized and sanctioned by Local No. 677; and that the arrangements for the picketing were made by respondent, Rocco Locantore, business representative of Local No. 677, who also supervised the picketing.
The Board also found that Local No. 677 is a constituent member of the Philadelphia Local Joint Executive Board of the Hotel and Restaurant Employes International Alliance and Bartenders League of America, of the respondents, and that the latter organization did not issue any orders with respect to the picketing of the Imperial Hotel and Restaurant, or participate therein. Two of the individual respondents, Vera Ulrich and Andrew Forte, were not included in the Order of the Board, probably for the reason that, while the Board found as a fact that they were members of Local No. 677, and participated in the picketing at sometime between June 13, 1947, and September 22, 1947, there was no finding that they so participated after the effective dates of the Amendments, July 7, 1947, and September 1, 1947.
One more observation is in point. It does not appear from any of the Board's findings, that these respondents, or any of them, engaged in the use of any threats, intimidation, force, coercion or sabotage in the maintenance of the picket line at the complainants' establishment. The Board says in the course of its "Discussion" in the Nisi Decision: "There appears to be no evidence in the present case of any coercive pressure other than the maintenance of the picket line exercised upon any of the suppliers or patrons of the Imperial Hotel and *Page 254 
Cafe. There is no evidence of any overt act on the part of the respondents revealing any threats, intimidation, force or coercion to prevent the obtaining, use or disposition of materials, equipment or services, or of the Union conspiring with the patrons or suppliers to withhold their patronage and services." The case appears, in consequence, to be one of mere "peaceful picketing" by persons not employes of the place of business picketed.
Subsection 2, clause (d), of Section 6 of the Labor Relations Act (43 PS 211.6), the Amendment of June 30, 1947, provides: "(2) It shall be an unfair labor practice for a labor organization, or any officer or officers of a labor organization, or any agent or agents of a labor organization, or any one acting in the interest of a labor organization, or for an employe or for employes acting in concert . . . (d) To picket or cause to be picketed a place of employment by a person or persons who is not or are not an employe or employes of the place of employment."
The freedom of speech and of the press, which are secured by the First Amendment against abridgment by the United States, are among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a state. Thornhill v. Alabama, 310 U.S. 88,60 S.Ct. 736, 740.
The freedom of speech thus constitutionally guaranteed contains within it the right of peaceful picketing. This much is clear from the ruling in Carlson v. California,310 U.S. 106, 60 S.Ct. 746, where the Court said (60 S.Ct. 749): "The carrying of signs and banners, no less than the raising of a flag, is a natural and appropriate means of conveying information on matters of public concern. Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484. For the reasons set forth in our opinion in Thornhill v. Alabama, supra, publicizing the facts *Page 255 
of a labor dispute in a peaceful way through appropriate means, whether by pamphlet, by word of mouth or by banner, must now be regarded as within that liberty of communication which is secured to every person by the Fourteenth Amendment against abridgement by a state."
In Thornhill v. Alabama, supra, the Court said (60 S.Ct. 744): "In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. . . . Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society. . . . It is true that the rights of employers and employes to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the State to set the limits of permissible contest open to industrial combatants. See Mr. Justice BRANDEIS in Duplex Printing Press Co. v. Deering,254 U.S. 443, at page 488, 41 S.Ct. 172, 184, 65 L.Ed. 349, 16 A.L.R. 196. It does not follow that the State in dealing with the evils arising from industrial disputes may impair the effective exercise of the right to discuss freely industrial relations which are matters of public concern. A contrary conclusion could be used to support abridgment of freedom of speech and of the press concerning almost every matter of importance to society. . . . The safeguarding of these means [of enlightening the public on the nature and causes of a labor dispute] is essential to the securing of an informed and educated public opinion with respect to a matter which is of public concern. It may be that effective exercise of the means *Page 256 
of advancing public knowledge may persuade some of those reached to refrain from entering into advantageous relations with the business establishment which is the scene of the dispute. Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society. But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests. Abridgement of the liberty of such discussion can be justified only where the clear danger of substantive evils arises under circumstances affording no opportunity to test the merits of ideas by competition for acceptance in the market of public opinion."
In Westinghouse Elec. v. United Elec., 353 Pa. 446, our own Supreme Court said (p. 457): "The right of picketing, when free from coercion, intimidation and violence, is a right constitutionally guaranteed as one of free speech."
In American Federation of Labor v. Swing, 312 U.S. 321,61 S.Ct. 568, it was held that the common law policy of the State of Illinois, which asserted that "peaceful picketing or peaceful persuasion are unlawful when conducted by strangers to the employer (i. e., where there is not a proximate relation of employees and employer)", operated as an unconstitutional abridgement of the right of free speech. The material facts in that case are substantially identical with those before us. A union of those engaged in beauty work unsuccessfully tried to unionize Swing's beauty parlor. Picketing of the shop followed. To enjoin this interference with his business and with the freedom of his workers not to join a union, Swing and his employees began suit. The Illinois Courts entered a permanent injunction on the ground indicated. The Supreme Court of *Page 257 
the United States, in setting aside the injunction, said (61 S.Ct. 570): "All that we have before us, then, is an instance of 'peaceful persuasion' disentangled from violence and free from 'picketing en masse or otherwise conducted' so as to occasion 'imminent and aggravated danger'. Thornhill v. Alabama, 310 U.S. 88, 105, 60 S.Ct. 736, 746, 84 L.Ed. 1093. We are asked to sustain a decree which for purposes of this case asserts as the common law of a state that there can be no 'peaceful picketing or peaceful persuasion' in relation to any dispute between an employer and a trade union unless the employer's own employees are in controversy with him. Such a ban of free communication is inconsistent with the guarantee of freedom of speech. That a state has ample power to regulate the local problems thrown up by modern industry and to preserve the peace is axiomatic. But not even these essential powers are unfettered by the requirements of the Bill of Rights. The scope of the Fourteenth Amendment is not confined by the notion of a particular state regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the state. A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. American Foundries v. Tri-City Council, 257 U.S. 184, 209, 42 S.Ct. 72, 78,66 L.Ed. 189, 27 A.L.R. 360. The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ. Communication by such employees of the facts of a dispute, deemed by them to be relevant to their interests, can no more be barred because of concern for the economic *Page 258 
interests against which they are seeking to enlist public opinion than could the utterance protected in Thornhill's case. 'Members of a union might, without special statutory authorization by a state, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution.' Senn v. Tile Layers Union, 301 U.S. 468, 478,57 S.Ct. 857, 862, 81 L.Ed. 1229."
The decision in the Swing case was held controlling by our own Supreme Court in Friedman v. Blumberg, 342 Pa. 387. The plaintiff in that case conducted a small glazing business, the only person regularly engaged with him in it being his wife. Occasionally, when in need of extra help, he called in a man not a member of the defendant union. There was no controversy of any kind between the plaintiff and this occasional employe. Upon plaintiff's refusal to agree to employ only a member of the defendant union, the union picketed his store. In reversing a decree of the court below awarding an injunction against further picketing, the Court said (p. 388): "There was no evidence of any violence, although there was some of coercive threats by the business agent, not sufficient we think, under the recent rulings of the Supreme Court of the United States, to warrant us in continuing the injunction. We are constrained to hold in view of the decisions of the Supreme Court of the United States in Milk Drivers Union v. Meadowmoor Dairies,312 U.S. 287, 61 Sup. Ct. 552; American Federation of Labor v. Swing, 312 U.S. 321, 61 Sup. Ct. 568; and Bakery and Pastry Drivers and Helpers Local 802 of International Brotherhood of Teamsters v. Wohl, 313 U.S. 548, 61 Sup. Ct. 1108, reversing, per curiam, the New York Court of Appeals (284 N.Y. 784,31 N.E.2d 765) on the authority of the Swing case, (which decisions had not been delivered at the time the court below entered the decree) *Page 259 
that, under the circumstances here shown, an injunction to restrain the picketing cannot be sustained."
In Carpenters Joiners Union v. Ritter's Cafe, 315 U.S. 722,62 S.Ct. 807, the Supreme Court expressly reaffirmed its ruling in the Swing case, but held that the case at bar did not fall within its purview. The facts in the Ritter case are totally unlike those before us. Ritter, the owner of a restaurant, engaged a contractor, one Plaster, to construct a building wholly unconnected with the restaurant business, and a mile and a half away. Plaster employed non-union carpenters and painters. Members of the carpenters' and painters' unions began to picket Ritter's Cafe immediately after the construction got under way. According to the undisputed finding of the Texas courts, which the Supreme Court accepted as controlling, Ritter's Cafe was picketed "for the avowed purpose of forcing and compelling plaintiff [Ritter] to require the said contractor, Plaster, to use and employ only members of the defendant unions on the building under construction . . ." Holding the unions' activities to constitute a violation of the State anti-trust law, the Texas court enjoined them from picketing Ritter's Cafe.
The Supreme Court, rejecting the petitioners' claim that the Texas decree infringed the freedom of speech guaranteed by the Due Process Clause of the Fourteenth Amendment, said (62 S.Ct. 809): "In the circumstances of the case before us Texas has declared that its general welfare would not be served if, in a controversy between a contractor and building workers' unions, the unions were permitted to bring to bear the full weight of familiar weapons of industrial combat against a restaurant business, which, as a business, has no nexus with the building dispute but which happens to be owned by a person who contracts with the builder. The precise question is, therefore, whether the Fourteenth Amendment prohibits Texas from drawing this line in *Page 260 
confining the area of unrestricted industrial warfare. Texas has undertaken to localize industrial conflict by prohibiting the exertion of concerted pressure directed at the business, wholly outside the economic context of the real dispute, of a person whose relation to the dispute arises from his business dealings with one of the disputants. The state has not attempted to outlaw whatever psychological pressure may be involved in the mere communication by an individual of the facts relating to his differences with another. Nor are we confronted here with a limitation upon speech in circumstances where there exists an 'interdependence of economic interest of all engaged in the same industry', American Federation of Labor v. Swing, 312 U.S. 321, 326, 61 S.Ct. 568, 570, 85 L.Ed. 855. . . . The dispute concerns the labor conditions surrounding the construction of a building by a contractor. Texas has deemed it desirable to insulate from the dispute an establishment which industrially has no connection with the dispute. Texas has not attempted to protect other business enterprises of the building contractor, Plaster, who is the petitioners' real adversary. We need not therefore consider problems that would arise if Texas had undertaken to draw such a line. It is true that by peaceful picketing workingmen communicate their grievances. As a means of communicating the facts of a labor dispute peaceful picketing may be a phase of the constitutional right of free utterance. But recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that directly related to the dispute. Restriction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication. To deny to the states the power to draw this line is to write into the Constitution the notion *Page 261 
that every instance of peaceful picketing — anywhere and under any circumstances — is necessarily a phase of the controversy which provoked the picketing. Such a view of the Due Process Clause would compel the states to allow the disputants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose. . . . We hold that the Constitution does not forbid Texas to draw the line which has been drawn here. To hold otherwise would be to transmute vital constitutional liberties into doctrinaire dogma. We must be mindful that 'the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the State to set the limits of permissible contests open to industrial combatants.' Thornhill v. Alabama,310 U.S. 88, 103, 104, 60 S.Ct. 736, 745, 84 L.Ed. 1093."
It is worthy of particular note that, as is abundantly clear from a reading of the opinion, Texas' ban on peaceful picketing in the Ritter case, was sustained not because the picketers were strangers to the employer, but because their exertion of concerted pressure was directed at a business wholly outside the economic context of the real dispute. It is this circumstance, we believe, that distinguishes the case from theSwing and similar cases.
In Cafeteria Employees Union v. Angelos, 320 U.S. 293,64 S.Ct. 126, the Supreme Court even extended the ruling in theSwing case, and held that the State of New York was without power to enjoin peaceful picketing for organizational purposes, of a cafeteria conducted by the owners themselves without the aid of any employees. There was evidence in the case that the picketing was accompanied by false representations, knowingly made, both by word of mouth and by means *Page 262 
of signs and placards. The trial court did not differentiate between the legal and illegal acts, but enjoined the union in broad terms from picketing at or near respondents' places of business, and its decree was finally sustained by the Court of Appeals. In reversing the judgments, the Supreme Court said (64 S.Ct. 127): "That the picketing under review was peaceful is not questioned. And to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies — like 'unfair' or 'facist' — is not to falsify facts. In a setting like the present, continuing representations unquestionably false and acts of coercion going beyond the mere influence exerted by the fact of picketing, are of course not constitutional prerogatives. But here we have no attempt by the state through its courts to restrict conduct justifiably found to be an abusive exercise of the right to picket. We have before us a prohibition as unrestricted as that which we found to transgress state power in A. F. of L. v. Swing, supra. . . . But, as we have heretofore decided, a state cannot exclude working men in a particular industry from putting their case to the public in a peaceful way 'by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him'. A. F. of L. v. Swing, 312 U.S. at page 326, 61 S.Ct. at page 570, 85 L.Ed. 855."
Many additional authorities might be cited. We believe, however, that the cases which we have reviewed are sufficient for present purposes, and serve best to indicate the permissible area of state intervention and regulation with respect to picketing as a means of publicizing the facts of a labor dispute. We may add that later rulings of the United States Supreme Court evince no disposition on the Court's part to recede from its rulings in the cases cited, or to alter its views with *Page 263 
relation to the scope and content of constitutional guarantees.
Section 6, subsection 2, clause (d), the Amendment of June 30, 1947, is most comprehensive, and prohibits in broad and general terms the picketing of a place of employment by persons who are not employes of the place of employment. Its language leaves room for no exceptions based upon the lawfulness of the purpose of the picketing, its peaceful character, or the circumstances that the picketers have a legitimate economic interest to advance thereby, arising from their employment in the industry affected. With but slight changes, the language of the Supreme Court in the Angelos case, supra, aptly describes the legislation: "But here we have no attempt by the state through its courts to restrict conduct justifiably found to be an abusive exercise of the right to picket. We have before us a prohibition as unrestricted as that which we found to transgress state power in A. F. of L. v. Swing, supra." It is, of course, of no moment that in the case at bar, the prohibition is defined by statute, rather than by the judicial organ of the state. That this enactment exceeds the bounds within which the Fourteenth Amendment confines state power, follows inevitably, we think, from the pronouncements of the United States Supreme Court in the Swing and Angelos cases, supra.
We turn to a consideration of the remaining question in the case. Subsection 2, clause (D), of Section 6 of the Labor Relations Act (43 PS 211.6), the Amendment of July 7, 1947, provides: "(2) It shall be an unfair labor practice for a labor organization, or any officer or officers of a labor organization, or any agent or agents of a labor organization, or any one acting in the interest of a labor organization, or for an employe or for employes acting in concert . . . (D) To engage in a secondary boycott, or to hinder or prevent by threats, intimidation, force, coercion or sabotage the *Page 264 
obtaining, use or disposition of materials, equipment or services, or to combine or conspire to hinder or prevent by anymeans whatsoever, the obtaining, use or disposition ofmaterials, equipment or services" (Underscoring [Italics] ours).
The only portion of this clause with which we are concerned here, is that indicated by the underscoring. It is apparent that the prohibition therein contained comprehends every practicable method whereby employes acting in concert may publicize the facts of a labor dispute, whether in the vicinity of the place of business of an employer, or elsewhere. The things which employes may not combine or conspire to do, are the very things which would normally result from merely publicizing, without annoyance or threat of any kind, the facts of a labor dispute. A combination or conspiracy to hinder or prevent, and etc., can be proved merely by showing that others reacted in a way normally expectable of some upon learning the facts of a dispute. The practical effect of the clause is to permit concerted communication of the facts of a labor dispute, by picketing or otherwise, so long as it is ineffective, but to prohibit such activity so soon as it becomes effective.
The Labor Relations Act is, of course, essentially remedial, and not penal (United Retail Employees of Am., Local No. 134,v. Grant Co., Inc., 341 Pa. 70), but otherwise we see no distinction in principle between the clause under consideration and the statute involved in Thornhill v. Alabama, 310 U.S. 88,60 S.Ct. 736. In that case, Thornhill was convicted under Section 3448 of the State Code of 1923, of Alabama, which provided: "Section 3448. Loitering or picketing forbidden. — Any person or persons, who, without a just cause or legal excuse therefor, go near to or loiter about the premises or place of business of any other person, firm, corporation, or association of people, engaged in a lawful business, *Page 265 
for the purpose, or with intent of influencing, or inducing other persons not to trade with, buy from, sell to, have business dealings with, or be employed by such persons, firm, corporation, or association, or who picket the works or place of business of such other persons, firms, corporations, or associations of persons, for the purpose of hindering, delaying, or interfering with or injuring any lawful business or enterprise of another, shall be guilty of a misdemeanor; . . ." In declaring the statute "invalid on its face", and setting aside the conviction, the United States Supreme Court said (60 S.Ct. 742): "The statute as thus authoritatively construed and applied leaves room for no exceptions based upon either the number of persons engaged in the proscribed activity, the peaceful character of their demeanor, the nature of their dispute with an employer, or the restrained character and the accurateness of the terminology used in notifying the public of the facts of the dispute.
"The numerous forms of conduct proscribed by Section 3448 are subsumed under two offenses: the first embraces the activities of all who 'without a just cause or legal excuse' 'go near to or loiter about the premises' of any person engaged in a lawful business for the purpose of influencing or inducing others to adopt any of certain enumerated courses of action; the second, all who 'picket' the place of business of any such person 'for the purpose of hindering, delaying, or interfering with or injuring any lawful business or enterprise of another.' It is apparent that one or the other of the offenses comprehends every practicable method whereby the facts of a labor dispute may be publicized in the vicinity of the place of business of an employer. The phrase 'without a just excuse or legal excuse' does not in any effective manner restrict the breadth of the regulation; the words themselves have no ascertainable meaning either inherent or historical. Compare Lanzetta *Page 266 
v. New Jersey, 306 U.S. 451, 453-455, 59 S.Ct. 618, 619,83 L.Ed. 888. The courses of action, listed under the first offense, which an accused — including an employee — may not urge others to take, comprehends those which in many instances would normally result from merely publicizing, without annoyance or threat of any kind, the facts of a labor dispute. An intention to hinder, delay or interfere with a lawful business, which is an element of the second offense, likewise can be proved merely by showing that others reacted in a way normally expectable of some upon learning the facts of a dispute. The vague contours of the term 'picket' are nowhere delineated. Employees or others, accordingly, may be found to be within the purview of the term and convicted for engaging in activities identical with those proscribed by the first offense. In sum, whatever the means used to publicize the facts of a labor dispute, whether by printed sign, by pamphlet, by word of mouth or otherwise, all such activity without exception is within the inclusive prohibition of the statute so long as it occurs in the vicinity of the scene of the dispute."
Likewise, in Carlson v. California, 310 U.S. 106,60 S.Ct. 746, the United States Supreme Court held unconstitutional an ordinance of Shasta County, California, similar in all material respects to the enactment before us. The similarities sufficiently appear from the following portion of the opinion (60 S.Ct. 748): "Section 2 on its face declares it unlawful for any person to carry or display any sign or banner or badge in the vicinity of any place of business for the purpose of inducing or attempting to induce any person to refrain from purchasing merchandise or performing services or labor. It likewise makes it unlawful for any person to loiter or picket in the vicinity of any place of business for a similar purpose. The terms 'loiter' and 'picket' are not defined either in the ordinance or in authoritative *Page 267 
State decisions. Therefore, they must be judged as covering all the activities embraced by the prohibition against the carrying of signs in the vicinity of a labor dispute for the purpose mentioned. The ordinance does not proscribe the carrying of signs in other places or for the purpose of inducing or attempting to induce others to adopt courses of action not related to labor disputes. It contains no exceptions with respect to the truthfulness and restraint of the information conveyed or the number of persons engaged in the activity. It is true that the ordinance requires proof of a purpose to persuade others not to buy merchandise or perform services. Such a purpose could be found in the case of nearly every person engaged in publicizing the facts of a labor dispute; every employee or member of a union who engaged in such activity in the vicinity of a place of business could be found desirous of accomplishing such objectives; disinterested persons (who might be hired to carry signs) appear to be a possible, but unlikely, exception. In brief, the ordinance does not regulate all carrying of signs, but, on the contrary, proscribes the carrying of signs only if by persons directly interested who approach the vicinity of a labor dispute to convey information about the dispute.
"The sweeping and inexact terms of the ordinance disclose the threat to freedom of speech inherent in its existence. It cannot be thought to differ in any material respect from the statute held void in Thornhill's case."
Since none of the Board's findings in the case at bar indicate that the picketing was other than quiet and peaceable and orderly, the concluding paragraph of the Court's opinion in the Carlson case seems to point (60 S.Ct. 749): "The power and duty of the State to take adequate steps to preserve the peace and protect the privacy, the lives, and the property of its residents cannot be doubted. But the ordinance in question here *Page 268 
abridges liberty of discussion under circumstances presenting no clear and present danger of substantive evils within the allowable area of State control."
We think the decisions in the Thornhill and Carlson cases are decisive of the question, and that Section 6, subsection 2, clause (D), of the Labor Relations Act, is void as an unconstitutional denial of the right of free speech.
Counsel for the Board argues that Section 6, subsection 2, clauses (d) and (D), of the Labor Relations Act, are constitutional "when proper consideration" is given to Section 13 of the Act. Section 13 (43 PS 211.12) provides: "Nothing in this act shall be construed so as to interfere with, impede or diminish in any way the right of employes to strike." Counsel contends that, although Section 13 of the Pennsylvania statute does not mention the words "picket" or "picketing", it was the intention of the Legislature to include the right to picket within the meaning of the words "the right to strike". The argument rests upon the following language of the opinion inWeyerhaeuser Timber Co. v. Everett Dist. Council, Etc.,119 P.2d 643, 645 (Wash.): "The right to strike, . . . is expressly saved in § 163 of the act. And the Federal courts generally hold that, . . . the attendant right of peaceful picketing is in nowise restricted by the act." The Board's brief continues: "In effect, the Legislature of Pennsylvania has provided that it is not unlawful to picket, or cause to be picketed, a place of employment by strangers if and when the picketing comes within the constitutional guarantees of free speech and free assembly."
We cannot concur in this view of the proper construction to be given to Section 13. Even if we could, we do not see how the Board's positon would be strengthened in any wise. If the language of Section 13 were to be construed as securing to employees the free exercise of the constitutionally guaranteed right of free *Page 269 
speech, then the Board would still be without authority to enter the Order which it asks us to enforce.
Reference was made on page 4 of this opinion, to the decree of this Court enjoining the picketing which constitutes the subject-matter of these proceedings, and to the fact that said decree was affirmed by the Supreme Court of this Commonwealth on July 6, 1948. See Wilbank v. Bartenders, etc., Union,360 Pa. 48. In the course of its opinion in that case, the Supreme Court said (p. 50): "The plaintiffs conduct a hotel, restaurant and taproom with fourteen employes. There was no controversy between plaintiffs and their employes. A majority of them were not members of a labor union and did not wish to become members. The plaintiffs had no objection to any of their employees joining any union and offered no objection to defendants' effort to persuade them to join a union. Defendant union did not represent any of plaintiffs' employes. In April or May, 1947, the defendant, Rocco Locantore, the defendant union's business agent, submitted to plaintiffs for execution a form of contract to govern plaintiffs' relations with their employes and requiring plaintiffs to employ only union employes; Locantore informed plaintiffs that if they did not execute the contract picketing would result. Plaintiffs, desiring not to coerce their employes declined to comply with Locantore's request and the picketing followed as threatened." After discussing Section 4 of the Labor Anti-Injunction Act of 1937, the Court continued (p. 52): "This record presents a case directly within the amendment restoring general equity jurisdiction. 'A majority of [plaintiffs'] employes have not joined a labor organization.' They seem to prefer to exercise the right of not joining any union, a right which is protected by section 5 of the Pennsylvania Labor Relations Act of 1937, P. L. 1168, 43 PS 211.5. Section 6 of the same Act makes it 'an unfair labor practice' for an employer to interfere with, restrain or *Page 270 
coerce employes in the exercise of the rights guaranteed by the Act. 43 PS 211.6.
"Defendants' purpose in picketing was to require plaintiffs to force their employes to join the union or to discharge them and employ others who are members of the union. Such a purpose is clearly unlawful and subject to restraint. . . . The exercise of this general equity jurisdiction is not restricted by the Labor Relations Act; nor is such an organized effort to force plaintiffs to violate the law excused by saying, as appellants' brief does, that the picketing was done 'solely for organizational purposes by persons engaged in the same trade . . .' "
It is clear from the Court's reasoning that the award of an injunction was sustained on the ground that the purpose of the picketing was unlawful. Learned Counsel for the Board devotes a large part of his brief to the argument that because the purpose of the picketing was unlawful, the Board's Order was proper, and should be enforced. A wealth of authority is cited to the effect that peaceful picketing cannot be made the cover for concerted action against an employer in order to achieve an unlawful or prohibited object, such as to compel an employer to coerce his employes to join a union. Again, Counsel says: "As the picketing was unlawful because it was coercive, and for an improper purpose, it is now asserted that", — the amendments to Section 6 of the Act are constitutional.
We are not persuaded that the unlawfulness of the picketing has any bearing in these proceedings. Section 8 of the Labor Relations Act, as amended (43 PS 211.8) provides: "The board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice listed in section six ofthis act" (Emphasis supplied). Picketing for an unlawful purpose is not, under the Act, an unfair labor practice. Therein, our Act differs from those of some other States *Page 271 
cited in the Board's brief, — notably Wisconsin. In consequence, the purpose of the picketing is not within the Board's cognizance. We think the Board's jurisdiction ends with the determination whether or not an unfair labor practice has been committed, as defined by the Act. We are of opinion that the Board's Order in this case cannot draw any support from the exterior circumstance that a court of equity has found an unlawful purpose behind the picketing. The Order must stand or fall, according to whether or not the commission of an unfair labor practice has been established.
We have read and re-read all of the many authorities cited by the Board in its able and comprehensive brief. No useful purpose would be served by a detailed discussion of these cases. It suffices to say that we find nothing in any of them at variance with the views herein expressed.
The questions raised in this case involve matters of grave concern to both employers and employes, as well as the public generally. The adjustment of the sometimes conflicting interests of these groups is always a delicate and intricate business. It will be recognized, of course, that we are not dealing in this case with such considerations as the wisdom or fairness of social and economic policy. Our concern is solely with questions of constitutional power. And we are mindful of the rule that an Act of Assembly is to be declared void only when it violates the Constitution clearly, palpably, plainly: and in such manner as to leave no doubt or hesitation in the mind of the reviewing court. Penn Anthracite Mining Co. v.Anthracite Miners of Penna., 318 Pa. 401, 405. Nevertheless, we find ourselves unable to reconcile the prohibitions in the Act of Assembly in controversy, with the pronouncements of the United States Supreme Court in the cases herein cited. We are concluded by the decisions of that Court. American Federationof Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568. *Page 272 
Pennsylvania Labor Relations Board appealed.
The order of the court below is affirmed on the opinion of Judge SWENEY.