1621, Inc., Appellant, *v.* Wilson.

Argued April 25, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and EAGEN, JJ.

reargument refused January 11, 1961.

*Herbert S. Levin,* for appellant.

*Cecil B. Moore,* with him *Jacob S. Richman,* for appellees.

OPINION BY MR. JUSTICE COHEN, November 15, 1960:

Appellant 1621, Inc., owner and operator of a taproom-restaurant in Philadelphia, filed a complaint in equity seeking a preliminary injunction against certain named persons (appellees here) both in their individual capacities and as representatives of a class consisting of other persons, organizations and associations, to enjoin them from picketing and boycotting appellant's duly licensed establishment. At a hearing on the rule for preliminary injunction, the following facts were stipulated by counsel: Appellant is a Pennsylvania corporation; the appellees are all Philadelphia residents and constitute a class represented by the named appellees. Pursuant to an application filed by appellant and after due notice was posted on the premises and protests were filed and heard, the State Liquor Control Board approved a transfer of a restaurant liquor license to the premises in question. The transfer of this license was in accordance with the policy then expressed in the Liquor Code as interpreted by this Court in *Obradovich Appeal,* 386 Pa. 342, 126 A. 2d 435 (1956) (since modified by the legislature in the Act of August 25, 1959, P.L. 746, §1, 47 PS §4-404).[1] The unincorporated associations

---

[1] The following language was added to the section which gives the Liquor Control Board the power to grant or refuse a new license or the transfer of an existing license,

named as appellees herein ("3200 block of Turner Street Organization" and "Strawberry Mansion Council of Block Organizations") then appealed the approval of this license transfer to the court of quarter sessions, which appeal was quashed. Appellant's premises are zoned properly for the use in question, the area being zoned mixed industrial, commercial and residential. Appellant's operation of the business at that address as a taproom-restaurant began on November 13, 1959. Picketing began on November 17, 1959, and continued daily, except for Sundays, with the number of participating pickets disputed, appellant claiming that as many as seven picketed at one time and appellees claiming a maximum of five; and children acted as pickets. The following signs were carried by the pickets, "Luther King did it why can't we;" "Please do not patronize excess bar;" "We need classrooms not taprooms;" "Less taprooms, more classrooms, more playrooms;" "We don't need another taproom;" "This taproom open without court's approval;" "Help Strawberry Mansion approve;" "We can't be bought please don't patronize this bar;" "Be fair. Please do not patronize excess bar." None of the appellees were ever or are now employees of appellant, nor do they represent or act on behalf of any employee of appellant, or any association or labor union with which appellant is affiliated. Finally, no adequate remedy at law is available to appellant. After making these admissions part of the record, the chancellor, upon the request of appellant's counsel and

". . . that the board shall refuse any application for a new license or the transfer of any license to a new location if, in the board's opinion, such new license or transfer would be detrimental to the welfare, health, peace and morals of the inhabitants of the neighborhood within a radius of five hundred feet of the place proposed to be licensed. . . ."

over objection, took judicial notice of the fact that the picketing was detrimental to appellant's business and that it was causing some loss, however minimal, to appellant.

On December 7, 1959, the chancellor entered what he termed an Interim Order reserving decision on the application for a preliminary injunction, but limiting the pickets to three in number and otherwise regulating them. By order of the chancellor, December 18, 1959, was fixed as the date for the taking of testimony "on the question of a nuisance in fact, and on such other issues as may be relevant in the case." Appellees filed an answer to the complaint alleging that the picketing was orderly and lawful, that it was protected by the Federal and State Constitutions as a means of expression, and praying that the complaint be dismissed. Hearings were held on December 18, and 21, 1959, where the appellees presented testimony to prove that the operation of appellant's business constituted a nuisance in fact. When appellees' counsel informed the court that he intended to introduce over two hundred additional witnesses as to acts of nuisance, the chancellor fixed January 13, 14, 15, 1960, as further hearing dates. This appeal followed. Subsequently, appellant filed a statement in accordance with our Rule 40 conceding, for the purpose of this appeal only, that the appellees have presented and are prepared to present by many witnesses considerable testimony upon the basis of which the chancellor could find that the operation of appellant's business constituted a nuisance in fact.

Appellees contend initially that this appeal should not be entertained because the chancellor's Interim Order was interlocutory and therefore not appealable, and that there is no statute making such an order appealable. The rule is clear that unless a special

right to appeal is expressly given by statute, an appeal will lie only from a definitive order, decree or judgment which finally determines the action. Such an order, decree or judgment is not final unless it terminates the litigation between the parties to the suit by precluding a party from further action in that court. *Stadler v. Mt. Oliver Borough,* 373 Pa. 316, 95 A. 2d 776 (1953) ; *Creighan v. Pittsburgh,* 389 Pa. 569, 132 A. 2d 867 (1957) ; 9 Stand. Pa. Prac., Appeals §20. Appeals are expressly allowed by statute, however, from the grant or refusal of a preliminary injunction. Act of Feb. 14, 1866, P.L. 28, §1, 12 PS §1101; Act of June 12, 1879, P.L. 177, §1, 12 PS §1102;[2] *Salus v. Lawrence,* 332 Pa. 429, 3 A. 2d 417 (1938) ; 9 Stand. Pa. Prac., Appeals §83. The question for our determination, therefore, is whether the chancellor's Interim Order constitutes a refusal to grant a preliminary injunction made appealable by this statute. If not, then the appeal cannot lie since the Interim Order did not finally determine the action nor terminate the litigation between the parties to the suit.

We have little difficulty in determining that the chancellor's order was properly appealable. The appellees rely upon the following words used by the chancellor in his December 7, 1959, Interim Order, "upon consideration of the application for preliminary injunction by the plaintiff [appellant here], the *Court reserves decision* and enters the following Interim Order." (Emphasis supplied.) From this the appellees infer that rather than refuse a preliminary injunction, the court merely reserved decision pending the taking of testimony in order to decide whether or not to grant

---

[2] The language of 12 P.S. §1102 provides that "In all cases in equity, in which a special or preliminary injunction has been refused by any court of common pleas, an appeal to the supreme court for the proper district shall be allowed. . . ."

the requested relief. They label this an interlocutory order which is not tantamount to a refusal to grant an injunction. We strongly disagree. Appellant's complaint alleged property damage and sought immediate injunctive relief. The chancellor, after hearing, refused such relief and instead reduced in number and otherwise regulated the pickets. In his opinion, filed in accordance with our Rule 43, the chancellor expressly states, *"We did not prohibit the picketing. At that time we held under advisement whether we would take testimony on the question of the existence of a nuisance in fact. Three days later, on December 10, 1959, after studying briefs of counsel, we directed that a hearing be held on such issue and any other relevant issues on December 18, 1959. . . . From the evidence we heard we found the picketing in this case did not have an unlawful object, was not forbidden by law and did not contravene public policy. Accordingly, we refused to issue the injunctive relief for which the plaintiff prayed."* (Emphasis supplied.) Even though couched in terms of an "interim order," the chancellor's edict in practical effect denied appellant's requested relief. The fact that the chancellor retained the matter and scheduled further hearings on whether appellant was conducting a nuisance (which, if true, would only provide further ground for denial of injunctive or other relief) is not significant in view of the court's order. This situation must be treated on appeal as equivalent to the refusal of a preliminary injunction which constitutes an appealable order. Were we to interpret otherwise the effect of such an order we would be encouraging its utilization to prevent appeals by complainants who have sought relief and effectively been denied it, thereby thwarting the will of the legislature as expressed in 12 PS §1102.

We have long followed the rule that, "on an appeal from a decree which refuses, grants or continues a preliminary injunction, we will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable: [citing cases]." *Lindenfelser v. Lindenfelser,* 385 Pa. 342, 343-344, 123 A. 2d 626 (1956) ; *Strano v. Local Union No. 690,* 398 Pa. 97, 156 A. 2d 522 (1959). Since the chancellor based his refusal to grant the requested relief on the ground that the picketing was proper and lawful, we must determine whether the rules of law he applied in arriving at this conclusion were the proper ones and applicable in these circumstances.

In *Reid v. Brodsky,* 397 Pa. 463, 156 A. 2d 334 (1959), a divided court less than a year ago found it unnecessary to reach the fundamental constitutional question raised in the instant proceeding.[3] Mr. Justice BENJAMIN R. JONES, speaking for the majority, expressly reserved such determination, stating, "In view of our decision that the operation of this taproom-restaurant be enjoined it is unnecessary for us to determine the legality of the picketing and display of signs by appellees. The objective of the picketing—the cessation of operation of the restaurant—having been judicially determined it would be purely academic to engage in a

---

[3] The writer of this opinion dissented in *Reid* because the majority held that the operation of that particular taproom-restaurant constituted a nuisance despite the fact that picketing began immediately after the opening of the establishment and prior to the occurrence of any misconduct. The establishment thus never had the opportunity to operate without the presence of the harassing tactics employed by those pickets.

discussion of the legality of the picketing which has now ceased."

The facts, as disclosed by stipulation and nowhere disputed, indicate that the appellees were engaged in peaceful picketing. They disclose a group of people parading back and forth on the pavement in front of appellant's establishment holding forth placards which by means of a written plea urge all persons who are within sight not to patronize the liquor establishment at its present location. The record is devoid of evidence indicating rioting, violent conduct or mass picketing; devoid of evidence of any communication, i.e. threats express or implied, between the pickets and potential patrons or suppliers which might indicate intimidation or coercion, either physical or psychological; and devoid of evidence that the picketing in any way created or contributed to a disturbance. We must assume from this record that persons passed freely without any molestation or interference through the picket line to enter the appellant's premises. Completely absent are those non-speech elements of picketing which have, in prior cases, been the basis and justification for state interference. Also lacking is that often essential element of a labor-management contest—the *union picket line,* which, because of union rules, is particularly effective at convincing members, their families and affiliates not to cross the line and enter the premises. We have, thus, nothing more than an attempt at persuasion, an appeal not to patronize this liquor establishment which the pickets, representing neighborhood groups, consider undesirable.

The freedom of speech and of the press, included within which is the right to publicly communicate one's ideas to others and to air grievances, which are secured by the First Amendment of the Federal Constitution against abridgement by the Federal Government, oc-

cupy a prominent position among the fundamental personal rights and liberties which are secured to all persons by the due process clause of the Fourteenth Amendment against abridgement by a state. *Staub v. City of Baxley,* 355 U.S. 313, 321, 2 L. ed. 2d 302 (1958); *Pa. L.R.B. v. Ches. & Del. Cos. Bartenders,* 361 Pa. 246, 64 A. 2d 834 (1949).[4] The Fourteenth Amendment has been successfully invoked on numerous occasions to prohibit state action which would effectively inhibit the right to convey ideas and information whether by handbill, pamphlet, booklet, poster or banner, or the right to freely associate as one chooses. *Martin v. Struthers,* 319 U.S. 141, 87 L. ed. 1313 (1943); *Jamison v. Texas,* 318 U.S. 413, 87 L. ed. 869 (1943); *Schneider v. Irvington,* 308 U.S. 147, 84 L. ed. 155 (1939); *Lovell v. Griffin,* 303 U.S. 444, 82 L. ed. 949 (1938). This protection has been broadly extended to include even anonymous speech and association. *Talley v. California,* 362 U.S. 60, 4 L. ed. 2d 559 (1960); *Bates v. Little Rock,* 361 U.S. 516, 4 L. ed. 2d 480 (1960); *N.A.A.C.P. v. Alabama,* 357 U.S. 449, 2 L. ed. 2d 1488 (1958); *Sweezy v. New Hampshire,* 354 U.S. 234, 1 L. ed. 2d 1311 (1957). Whether the state interference with protected activities is by means of legislative or judicial action can have no constitutional significance. *N.A.A.C.P. v. Alabama,* supra at 463. "Freedoms such as these [speech, press, assembly and association] are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference. [citing cases]." *Bates v. Little Rock,* supra, at 485. The constitutional test established in these free speech

---

[4] Freedom of speech is also expressly protected by Article I, Sec. 7 of the Pennsylvania Constitution which provides, inter alia, that ". . . every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."

cases is that "Where there is a significant encroachment upon personal liberty, the state may prevail only upon showing a subordinating interest which is compelling. [citing cases]." *Bates v. Little Rock*, supra, at 486. Cf. *N.A.A.C.P. v. Alabama*, supra at 463.[5]

Since the decision in *Thornhill v. Alabama*, 310 U.S. 88, 60 S. Ct. 736 (1940), wherein peaceful picketing was equated with other means of expression and accorded the same constitutional protection as free speech,[6] the United States Supreme Court has evolved

[5] We find no justification whatsoever for the application of a different test of constitutionality to picketing cases where the non-speech elements are not present than the test to be applied in cases involving other means of expression. See Edgar A. Jones, Jr., Picketing and the Communication of Ideas, 2 U.C.L.A. L. Rev. 212 (1955) ; Francis E. Jones, Jr., Free Speech: Pickets on the Grass, Alas! Amidst Confusion, A Consistent Principle, 29 So. Calif. L. Rev. 137 (1956).

[6] In *Carlson v. California*, 310 U.S. 106, 112-113, 84 L. ed. 1105 (1940), a companion to *Thornhill*, it was held that the constitutional right of free speech had been abridged by a local ordinance making it without qualification, unlawful to carry or display any banner in the vicinity of any works, factory, place of business or employment for the purpose of influencing or attempting to influence any person to refrain from entering therein or to refrain from purchasing or using any goods manufactured therein. The Court significantly stated, "The carrying of signs and banners, no less than the raising of a flag, is a natural and appropriate means of conveying information on matters of public concern. Stromberg v. California, 283 U.S. 359, 75 L. ed. 1117, 51 S. Ct. 532, 73 A.L.R. 1484. For the reasons set forth in our opinion in Thornhill v. Alabama, supra, publicizing the facts of a labor dispute in a peaceful way through appropriate means, whether by pamphlet, by word of mouth or by banner, must now be regarded as within that liberty of communication which is secured to every person by the Fourteenth Amendment against abridgment by a state."

These two cases altered completely the law of picketing. Previously based on tort principles, picketing became at least partially enveloped with a cloak of constitutional protection. See Tanenhaus, Picketing—Free Speech: The Growth of the New Law of Picketing

a doctrine whereby a state may, consistent with the Federal Constitution, enjoin picketing which in a particular case has an objective which violates a legitimate clearly-defined law or public policy of the state. A state may not, however, constitutionally equate picketing itself with coercion or with a violation of state policy. See, e.g., *International Brotherhood of Teamsters v. Vogt*, 354 U.S. 284, 1 L. ed. 2d 1347 (1957). Cf. *Newell v. Chauffeurs Teamsters Local 795*, 356 U.S. 341, 2 L. ed. 2d 809 (1958), reversing per curiam 181 Kan. 898, 317 P. 2d 817.[7] This Court on several occa-

---

From 1940 to 1952, 38 Corn. L.Q. 1 (1952). Tort doctrine regarded picketing as illegal unless justified; free speech doctrine considers restraints upon picketing unconstitutional unless justified. The burden of proof rests, since *Thornhill*, on those who seek to limit picketing.

This Court was not long in following the lead of the Supreme Court. In *Westinghouse Elec. v. United Elec.*, 353 Pa. 446, 457, 46 A. 2d 16 (1946), we clearly stated, "The right of picketing, when free from coercion, intimidation and violence, is a right constitutionally guaranteed as one of free speech."

[7] In *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 93 L. ed. 834 (1949), the picketing held enjoinable was an essential part of a single and integrated course of conduct designed to compel a violation of Missouri's valid anti-trust law. In *Hughes v. Superior Court of California*, 339 U.S. 460, 94 L. ed. 985 (1950), the objective of the picketing was to secure from a retail establishment submission to a demand for employment of Negro clerks in proportion to the number of its then Negro customers. If successful, the picketing would have caused the retailer to discriminate on the basis of race in its hiring policies, contrary to the declared public policy of the state of California. In *International Brotherhood of Teamsters C.W.&H. Union v. Hanke*, 339 U.S. 470, 94 L. ed. 995 (1950), the objective was to secure compliance with a demand to establish a union shop which, when struck in the balance with other competing interests, was contrary to a valid public policy of the State of Washington. In *Building Service Employees International Union v. Gazzam*, 339 U.S. 532, 94 L. ed. 1045 (1950), it was held that the object of the picketing was to compel a violation

sions has professed to apply this very principle. See, e.g., *Grimaldi v. Local No. 9, Journeyman Barbers, etc. et al.,* 397 Pa. 1, 153 A. 2d 214 (1959) ; cert. denied 361 U. S. 901 (1959) ;[8] *Fountain Hills Underwear Mills v. Amalgamated Clothing Workers Union of America,* 393 Pa. 385, 143 A. 2d 354 (1958) ; *Anchorage, Inc. v. Waiters & Waitresses Union,* 383 Pa. 547, 119 A. 2d 199 (1956) ; *Sansom House Enterprises, Inc. v. Waiters & Waitresses Union,* 382 Pa. 476, 115 A. 2d 746 (1955), cert. denied 350 U. S. 896; *Wortex Mills v. Textile Workers Union of America,* 369 Pa. 359, 85 A. 2d 851 (1952) ; *Pa. L. R. B. v. Ches. & Del. Cos. Bartenders,* supra. Because of the legitimacy of their ob-

of Washington's statutory policy against employer coercion of employees' choice of bargaining representative. In *United Ass'n. J.P.&S. v. Graham,* 345 U.S. 192, 97 L. ed. 946 (1953) the object of the picketing was to compel a violation of Virginia's "Right to Work" law. In *Pappas v. Stacey,* 151 Me. 36, 116 A. 2d 497 (1955), appeal dismissed for want of a substantial federal question, 350 U.S. 870, 100 L. ed. 770 (1955), the object was to compel a violation of Maine's policy against an employer's interference with the free choice of the employees in the matter of organization. And finally, in *International Brotherhood of Teamsters v. Vogt,* supra, the object of the picketing was found to be contrary to Wisconsin's statutory policy against an employee's coercing or intimidating an employer to interfere with any of his employees in the enjoyment of their legal rights.

The present state of the law of picketing is therefore: like any other speech, picketing is protected by the Constitution—as a *means;* however, like other expression media, it is not protected when used for the purpose of accomplishing an unlawful *end.*

[8] The writer of this opinion dissented in *Grimaldi* because he felt that the legitimate interest of the Local (See 397 Pa. 1, 19-20, 22-24) which represented a substantial proportion of the class of barbers to which Grimaldi belonged was at least as important to the community as the interest of the individual proprietor, and that on balance, the picketing for organizational purposes was not in furtherance of an unlawful objective in violation of the public policy of the Commonwealth.

jectives, the defendants in *Watch Tower Bible and Tract Society v. Dougherty,* 337 Pa. 286, 11 A. 2d 147 (1940) were held justified in withdrawing their patronage or threatening to do so and in inducing others to do likewise.[9]

Our inquiry must thus turn to the objective or objectives sought by the pickets in the instant case. The appellees' brief informs us that the organizations which are represented by the appellees were "organized to protect the health and general welfare of the area involved." Because they believed that the presence of appellant's taproom in their midst constituted a nuisance by attracting undesirable persons to the area who loudly used vile, profane and vulgar language within the hearing of other persons on the street; that these undesirables had urinated on the sidewalk and in the alleys, had regurgitated on the pavement, had blown their car horns and had double parked thereby obstructing traffic (all of which was found as fact by the chancellor); and that these occurrences had disrupted and threatened the peace, dignity and morals of the neighborhood and were a corrupting influence upon their children, the appellees began parading in front of appellant's establishment carrying aloft the aforementioned placards. Their objective was obvious: to convince passersby, by means of persuasion, not to patronize the establishment so that in time its opera-

---

[9] Picketing, in some instances, may indeed have a coercive effect, but to characterize *all* picketing as *per se* coercive is to confuse persuasion with coercion. See Edgar A. Jones, Jr., Picketing and Coercion: A Jurisprudence of Epithets, 39 Va. L. Rev. 1023 (1953); Gregory, Picketing and Coercion: A Defense, 39 Va. L. Rev. 1053 (1953); Jones, Picketing and Coercion: A Reply, 39 Va. L. Rev. 1063 (1953); Gregory, Picketing and Coercion: A Conclusion, 39 Va. L. Rev. 1067 (1953). See also Jones, Picketing and the Communication of Ideas, 2 U.C.L.A. L. Rev. 212, 220-221, notes 37, 38 (1955).

tion would become uneconomical and appellant would therefore transfer the liquor license to another location, or, failing in that, to persuade the appellant to so police his patrons that the most blatant of the evils complained of would cease so that the peacefulness and good character of the neighborhood would not be destroyed.

Are such objectives unlawful or in violation of some public policy of the Commonwealth? We think not. The appellees' purpose was to protect against an admitted nuisance in fact. In doing so, they have simply chosen to utilize one means of expression rather than another.

While it is true that appellant's establishment at its present location was sanctioned by an appropriate organ of the state government and the Liquor Control Board's approval of the transfer of appellant's license was in accordance with the then declared policy of the Commonwealth, the legislature has since seen fit to change this theory of licensing. But more important, however, the operation of this establishment by admission of counsel constitutes a nuisance in fact. The conclusion seems to us inescapable that, on balance, the interest, both economically and socially, of these property owners and residents in abating an admitted nuisance in fact, in keeping up property values and in maintaining a decent neighborhood in which to reside, outweighs the interest of the appellant.

Hence, since the objective of the picketing does not violate a legitimate, clearly defined law or public policy of the state, we cannot say that the lower court applied law palpably wrong or clearly inapplicable in refusing to grant the injunctive relief as prayed for.

Order affirmed.

Mr. Justice BELL and Mr. Justice EAGEN concur in the result.