Grimaldi *v.* Local No. 9, Appellant.

Argued April 21, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and MCBRIDE, JJ.

*Louis H. Wilderman,* with him *Richard H. Markowitz,* and *Wilderman & Markowitz,* for appellants.

*John Ryan,* with him *James L. J. Pié,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, July 2, 1959:

Louis J. Grimaldi is the owner of, and the only barber in, a barber shop located at 1438 South 58th Street, Philadelphia. Thus, he has no employees, and at the same time he has no employer. He is a one-man operation, solely and exclusively. He opens his shop when he pleases, he closes it when it suits his will to do so. He has no labor trouble because he employs no labor. He has no dispute with an employer because, obviously, he has no employer. He is as much a one-man operation as a man on a unicycle. He has as much undisputed control over his barber shop as Robinson Crusoe had over his island on the Thursday before Friday arrived.

Although, as mentioned, Grimaldi has no labor problem within the confines of his domain, on July 31, 1956 a major trouble was deposited on his doorstep and a haunting threat began to walk his sidewalk, none of which dire visitations he provoked, and certainly did not desire. On that morning, there appeared outside his shop several men wearing sandwich signs calling upon Grimaldi to join Local No. 9, Journeymen Barbers,

Hairdressers and Cosmetologists International Union (hereinafter to be referred to as Local No. 9). This union is made up of barbers, hairdressers and cosmetologists who are employees in barber and beauty shops owned by others. Grimaldi is not qualified for membership in this union because he is not an employee. As already stated, and as will be repeated, he is a one-man institution. He works for no one else. He toils only for himself. He cuts hair, shaves faces, administers shampoos, applies lotions and does all that is traditionally expected of a barber. As absolute owner of his place of business, and as master of himself and his work, he would be entirely out of place in a union composed of men who are employees in shops in which they do not have the slightest proprietary interest.

At meetings of Local No. 9, the discussions naturally revolve around such subjects as wages to be asked of employers, working conditions to be requested of employers, vacations to be sought of employers. Grimaldi could not participate in such discussions because it would be grotesque for him to ask himself how much salary he should pay himself, how much vacation he should allow himself, and what working conditions he should demand of himself.

Nevertheless, on July 31, 1956, pickets appeared in front of Grimaldi's place of business with signs urging prospective customers to stay away. The picketing was effective. Many patrons turned on their heels when they read the signs; men with supplies refused to cross the picket line; deliveries of towels ceased. Stagnation was immediate and decisive. With customers frightened away, supplies cut off, and laundry service severed, it could only be a matter of days until Grimaldi's business would expire like an undersea diver whose oxygen line has knotted. He appealed to the courts. He petitioned the Court of Common Pleas of Philadelphia

County to restrain and enjoin Local No. 9, with its officers and members, from picketing his shop, from interfering with his business, and from intimidating or attempting to intimidate him to join Local No. 9.

After a hearing before Judge WATERS, a preliminary injunction issued, and then, on March 20, 1958, a full hearing on the merits of the cause was heard before Judge WEINROTT of Court of Common Pleas No. 5 who, on January 8, 1958, entered a final decree which granted the plaintiff the full relief prayed for. The defendants filed exceptions which were dismissed by Judge REIMEL, speaking for the court en banc. Local No. 9 and its named officers and members appealed to this Court.

The decree must be affirmed. The picketing attempted by Local No. 9 is a flagrant violation of the law and cannot be supported. The picketing of a one-man establishment is an invasion of an American's freedom to determine his own economic destiny when he stands alone in an enterprise of his own. Labor unions have the right to picket for organizational purposes, that is, to persuade non-union employees of an establishment to join a union. Such peaceful picketing is constitutionally protected and cannot be enjoined (*Pappas v. Local Joint Exec. Bd.,* 374 Pa. 34). But the picketing in this case was not for organizational purposes and could not be for that purpose. There are no non-union employees in Grimaldi's shop. On what basis then, can there be lawful picketing for organizing employees? What is to be organized? Who are to be united?

Local No. 9, through its secretary Vincent Pace, of whom more will be said later, inflicted upon Grimaldi an harassment and intimidation which violated his rights and prerogatives as a United States citizen. Because he refused to join something he did not need and which could not help him he was threatened with eco-

nomic extinction—and then the means to so extinguish him were put into motion. The action of Local 9 also obviously offended against the recognized policy of organized labor, as announced by responsible labor leaders at legislative hearings and as they have been reviewed by the courts in recorded legislation.

In the early part of January, 1956, Vincent Pace, accompanied by three other men of Local 9, called on Louis Grimaldi in his barber shop and endeavored unsuccessfully to persuade him to join the union. Two or three other conferences followed with similar negative results. Then, on April 16, 1956 Vincent Pace, accompanied by five members of Local 9, met with Louis Grimaldi and five other self-employed barbers who were members of a social and educational organization known as the Pennsylvania League of Master Barbers. At this meeting Pace endeavored to induce the self-employed barbers to dissolve the Pennsylvania League of Master Barbers and to join up with Local No. 9. When Grimaldi and his companions stated they were not receptive to this idea, Pace became very abusive. He called the officers of the Pennsylvania League of Master Barbers opprobrious names and used language which was profane, vicious and obscene. He then outrightly threatened the organization and its members, declaring that if the self-employed barbers did not join his local, he would bestow upon them the "kiss of death." His threats were all garbed in a vileness of speech that offends the very paper on which it is printed.

Grimaldi and his companions refused to be intimidated and returned to their respective barber shops. On the morning of July 31, 1956, when Grimaldi arrived at his establishment to open it for business, he found two of Pace's men sitting at the curb in a "cream colored Cadillac." They informed him that it was his

"turn to join." Grimaldi replied, "Look, fellows, how many times must you be told that I can't join your union? You know my position. I can't join your union.", and went into his shop to prepare for the day's work.

Several minutes later one of the Cadillac-borne men knocked at Grimaldi's door and informed him: "Well, we called up the office and we were told to picket your shop." Grimaldi replied, "Gentlemen, there's a big, wide sidewalk. Go ahead."

A few minutes later police arrived in response to a call made by the operator of a beauty shop in the vicinity. Still later the police captain of the district appeared, and when Grimaldi asked him "What can you do about this?" the police captain answered: "I can't do anything about it. The only thing I can do here is to see that nothing happens."

The pickets then, as Grimaldi was to testify later, "walked around the shop, you know, back and forth, back and forth, back and forth." And as they walked back and forth, Grimaldi's customers walked away.

The lower court found that this picketing was coercive and illegal and therefore enjoinable. Local 9, through its attorneys, argue that the court's injunction was illegal under the Labor Anti-Injunction Act of June 2, 1937, P.L. 1198, 43 P.S. §206(a) et seq., as amended, which provides that no court shall have jurisdiction to issue an injunction "in any case involving or growing out of a labor dispute." But the Act has no application here. The Act specifically states that: "(a) A case shall be held to involve or to grow out of a labor dispute when the case involves *persons* who are engaged in a single industry, trade, craft or occupation, or have direct or indirect interests therein, or who are *employes* of the same employer, or who are members of the same or an affiliated organization of employers or employes . . ." (Emphasis supplied)

It will be noted that the statute uses the plural throughout. It speaks of "persons," of "employes," and of "members." But there are no persons, employes or members in Grimaldi's shop. There is only one person there—and no employes or members at all.

In defining a labor dispute the Act says: "(c) The term 'labor dispute' includes any controversy concerning terms or *conditions of employment,* or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to *arrange terms* or *conditions of employment* or concerning employment relations or *any other controversy arising out of the respective interests of employer and employe,* regardless of whether or not the disputants stand in the proximate relation of employer and employe, and regardless of whether or not the *employes* are on strike with the employer." (Emphasis supplied)

The Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168 (43 P.S. §211.1), which Local 9 also attempts to invoke in its behalf, offers no more legal support to its contention than the Labor Anti-Injunction Act. The Labor Relations Act specifically declares in its title that it is: "An act to protect the right of *employes* to organize and bargain collectively." (Emphasis supplied.) Here again we find the plural "employes." The Act then defines "labor dispute" as any controversy concerning: "(1) Terms, tenure or conditions of employment; or concerning (2) The association or representation of persons negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employe."

Under the specific wording of both statutes, there was no labor dispute at 1438 South 58th Street. There was no controversy over conditions of employment and there was no discord arising out of "respective inter-

ests of employer and employee." Nor could there be, since there was no employer or employee at Grimaldi's shop. Moreover, the Local did not claim, and does not now claim, that Grimaldi was charging unfair prices or that he was working improper hours, or that he was undermining in any way the working conditions of journeymen barbers—those employed in other shops.

The picketing of Grimaldi's shop had no bearing on conditions of labor or employment in other shops. In an Illinois case it was held that where the picketing is not designed to improve the conditions of labor of other employees it will be enjoined. In that case, the Appellate Court of Illinois (Second District) said: "There is no contention made by defendant that plaintiffs [self-employer owners of gasoline stations] were failing to meet the standards of wages and employment fixed by unions and thereby jeopardizing the rights of workingmen in the same industry, for the plaintiffs had no employees to whom they could pay wages . . . It is, therefore, the considered judgment of this court that defendant's conduct was motivated by the illegal purpose of coercing self employed owners and operators of gasoline stations who hired no employees to join the union and sign an agreement, the net effect of which would only stifle competition, and in no way improve the conditions of labor of its members, and that defendant exercised unlawful means to effectuate this purpose." (*Dinoffria v. International Teamsters Union*, 331 Ill. App. 129)

Grimaldi's industrial status is entirely different from that of the journeymen barbers who belong to Local 9. Grimaldi, as a one-man, self-employed barber, lives in an economic world entirely different from the one inhabited by the journeyman barber. The journeyman barber receives wages from his employer, he is saddled with no financial burden so far as the shop is

concerned, he pays no rent, buys no equipment, he suffers no personal loss in the event of fire or other disaster. The self-employed barber, on the other hand, carries the whole responsibility of the shop on his back, he owns or rents the place in which he conducts his business, he purchases the equipment, he pays all expenses in maintaining the shop and keeping it clean. If there is a fire, he personally suffers what is lost. Of course, all profits of the business are his, as all losses are borne by him.

Grimaldi's position in Philadelphia is not unique. There are some 2,600 barber shops in Philadelphia. Of this number, 1700 are one-man shops, leaving only 900 which are manned by multiple barbers. Why should 1700 legitimately-owned and legitimately-operated institutions be required to conform to the standards of practically only one-half that number? While, of course, no one can or would object to the multiple-operated barber shop, there are many people who prefer being barbered in a one-man shop, and there is no reason in the law, no custom in society, and no argument in the armory of common sense which militates against the enjoyment of that one-man service.

The profession of barbering is an old and honored one. There was a time when the barber was, in a measure, also a surgeon. His functions included the dressing of wounds, blood-letting, and other surgical operations. While the barber of today, of course, no longer practices surgery in any form (intentionally!), he is still an indispensable and highly desirable factor in the pattern of today's civilization. And if the barber prefers to practice alone, no one may compel him to abandon his independence, while there is a public willing to avail itself of his specialized attention.

The one-man business in America contributes greatly to the well-being of the nation and its people. It is

not necessary to point out that much of the magnificent industrial and commercial structure which is America's greatest wealth today originated in one-man operations which pioneered, invented and dared to go forward alone in the development of ideas for the improvement of man's comforts and conveniences, as well as in protecting his physical and economic health.

Labor organizations are not concerned with one-man enterprises, except to encourage the proprietors in their endeavors, hoping that they will eventually achieve that success and expansion which will make it possible for them to employ workers, thereby increasing the prosperity and general well-being of the whole country. But until that happens, labor organizations allow these one-man affairs to proceed unhampered, unannoyed, and unpicketed. To picket a one-man job is like sticking pins into a hen that is sitting on eggs, concentrating on the important job of hatching vital forces which will contribute to the preservation of the human race. Labor organizations thus do not enter into the industrial barnyard until the new chickens are hatched and new workers are in being.

The purpose of labor organizations is to offer protection to multiple employees through collective bargaining, which is the backbone of the labor movement. It is the *e pluribus unum* of the industrial state. Where two or more workers are employed by the same employer, the way is open for them to form an organization for the purpose of discussing and negotiating with the employer on the subjects of wages and working conditions. Without collective bargaining, employees could be at the mercy of an employer who refuses to be guided by fundamental concepts in humanity and fair dealing.

But collective bargaining cannot possibly be used against an individual who has neither employees nor

employer. The very word *collective* excludes the solitary individual. A man cannot collect with himself. And if an attempt is made to use collective bargaining against an individual who does not come within the purport of collectiveness, damage is done to the very cause of collective bargaining. The blade which is used to strike down the innocent, becomes stained and blunted with injustice, thereby diminishing its capabilities for protecting those who are dependent on it for the protection of their inalienable rights.

The extraordinary tactics of Local 9 in this case cannot possibly help the cause of organized labor and could well draw the censure of labor leaders who are concerned about advancing the wholesome collective cause of labor and not in supporting ruffianism as displayed by Vincent Pace and his associates. Labor has come a long way since the era when the workman was practically looked upon as the serf of his master. The treatment of workmen in those years wrote a black page in the industrial history of mankind. Fortunately, that melancholy era is behind us. Legislation throughout the world and particularly in America has elevated the wage earner to a dignity which commands respect and consideration.

Wage earners who are welded together into a labor organization form an entity of responsibility and accountability which the law recognizes as a force for good in the economic and social society of the State. But Vincent Pace attempted to use Local 9 as a personal slingshot for the attainment of an objective which no labor organization ever heretofore attempted in Pennsylvania, so far as recorded litigation is concerned. The action of Local 9 detracts from labor's record, and, if unrestrained, could in itself write a page of oppressiveness of which no labor organization would be proud.

If Local 9 were to be allowed to picket as it attempted to picket here, it would mean that no individual could perform any work of his own without the possibility of molestation. Even a member of Local 9 itself could be harassed by the shadows of marching sandwich men if he mowed the lawn in his own back yard, or built a little wall around his garden, or dug a pond for his children to play in, or helped his wife to paper the walls in the kitchen. Moreover, if what Local 9 contended for would become law, it would mean that even a member of Local 9 when he retires would not be permitted to add to a pension or to social security payments. He could not knock together, with hammer and saw, a few little wood novelties to sell to passersby; he could not fashion with his hands some odd toys, souvenirs and knicknacks to vend to tourists in the little retreat to which he had withdrawn to spend the twilight days of his life; he would not be permitted to open a little store or to plant a garden in which to grow roses to bestow, for a consideration, on those who are distant from flower shops; he would be prohibited from roasting peanuts and selling them in little bags to those on the way to a sandlot baseball game. To picket a peanut vendor would be the ultimate in abuse of the weapon of picketing, but in principle it would be no different from what Local 9 endeavored to do against Grimaldi.

The picketing of a one-man business has dire and sinister possibilities. If Local 9 may drive a one-man barber shop out of business, why may not a hypothetical Local 999 do the same to a one-man lawyer's office? It could happen that the lawyers in large law offices would form a union and then demand that the country lawyer in his little office, or the city lawyer practicing by himself, join Local 999 or be humiliated and stripped of the emoluments of his profession by the placarding of

his office with signs that he is unfair to other lawyers. Doctors in large hospitals could form a union and picket the country doctor, demanding that he make calls only at certain hours and charge only certain minimum fees, or run the risk of having no patients at all because of the omnipresent threat of picketing. If the one-man barber may be picketed, so may the one-man engineer, the one-man architect, the one-man artist, and the one-man author. And if that should happen, then liberty in America would be known only as the name of a statue.

Local 9 cites *Friedman v. Blumberg*, 342 Pa. 387, in support of its alleged right to picket a one-man business, but in that case the business man involved (a glazier), did employ a man to assist him, and the question in controversy was whether the employee should or should not be a union man. We repeat that in the instant case, there is no employee. The case of *Schwartz v. L. & L. S. Driv. Union*, 339 Pa. 353, also cited by Local 9, is equally inapplicable to the facts in this case.

Moreover, the Supreme Court of the United States has already spoken on this subject in a manner which opposes Local 9's contention. In the case of *Teamsters Union v. Hanke*, 339 U. S. 471, a business conducted by the owner himself without employees was picketed by a labor union endeavoring to compel compliance with a demand for a union shop. The trial court which heard the application for an injunction against the picketing union issued an injunction which the Supreme Court of the State of Washington affirmed. An appeal was taken to the Supreme Court of the United States on the averment that the injunction offended against the Fourteenth Amendment. The Supreme Court of the United States rejected the contention and said: "But when one considers that issues not unlike those that are here have been similarly viewed by other States and by the Con-

14

gress of the United States, we cannot conclude that [the State of] Washington, in holding the picketing in these cases to be for an unlawful object, has struck a balance so inconsistent with rooted traditions of a free people that it must be found an unconstitutional choice. Mindful as we are that a phase of picketing is communication, we cannot find that [the State of] Washington has offended the Constitution."

Local 9 argues that it may not be enjoined from picketing Grimaldi as a one-man barber shop because picketing is a form of free speech, which is constitutionally guaranteed. While it is true that picketing is in the realm of free speech, it is by no means synonymous with talking. Any person may, so long as he keeps the peace, does not disturb traffic, and offends no specific law, stand on a street corner and express his views on any subject he wishes, but when he substitutes a stick and a placard for his tongue, he leaves speech and takes up a species of communication which is by no means the equivalent of talking. Of course, it is a form of communication which is allowed where collective bargaining is involved, and we have repeatedly so held, but here there is no controversy between management and labor for the simple reason that Grimaldi is not management and he is not labor. Picketing cannot operate in a vacuum.

Local 9 is a journeymen barber's union, that is, it is made up of barbers who are employed by others. We have stated that Grimaldi does not qualify for admission to Local 9. The pickets thus were demanding that Grimaldi do what he could not do in reason and common sense. They were demanding that he become subservient to the threatening Mr. Pace who does not live in Pennsylvania, is apparently not interested in Pennsylvania's welfare, and, so far as the record shows, had nothing to offer but menaces, abuse, and profanity.

The Supreme Judicial Court of Massachusetts had occasion to pass on the subject of picketing in a case where the facts were analogous to those involved here. In that case, *Saveall v. Demers*, 322 Mass. 70, the Court said: "Even if picketing is constitutionally protected in its aspect as speech, it must, because of its other aspects, be subject to some degree of regulation as to circumstance, manner, and even object, lest orderly existence be submerged in a flood of picketing by groups of people, having no peculiar right of their own, to make other people do what they do not wish to do and as free men are under no obligation to do . . . [We] have before us a case where, on the one hand, the contribution of the defendants' acts to the free interchange of thought in Fitchburg reaches the vanishing point, while on the other hand there is danger that the fundamental right of the plaintiff to work with his own hands to what he regards as his best advantage may be destroyed."

God gave man hands to use for self-protection and for the obtaining of food, shelter, raiment, and happiness for himself and for those dependent upon him. No one may deprive him of the benefits those hands may bring him when they are occupied in his own behalf. Those hands may be used to acquire property, the ownership of which will be protected by the Constitution of Pennsylvania which declares: "All men . . . have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." (Art. 1, Sec. 1)

In the exercise of that constitutional right, one may acquire for himself a barber's chair, a carpenter's bench, or a bricklayer's trowel, and so long as he uses these implements himself and in a manner which does

not adversely affect the economic rights of others, no one may dictate the method or the hours in which he may utilize them.

Local 9 was given every opportunity to present its case fully in the lower court and we are satisfied that the findings of fact and conclusions of law are justified by the record. We therefore affirm the decree entered in the Court of Common Pleas, and place the cost on the appellants.

Mr. Justice BOK concurs in the result.

---

DISSENTING OPINION BY MR. JUSTICE MCBRIDE:

THE JOURNEYMEN BARBERS, HAIRDRESSERS, COSMETOLOGISTS AND PROPRIETORS'[1] INTERNATIONAL UNION OF AMERICA consists of local unions and employers' guilds whose membership comprises barbers, hairdressers, wavers, marcellers, cosmeticians, manicurists, masseurs and proprietors (Article I, Section 1). In respect of barbers there are three classes: proprietor barbers,[2]

---

[1] The word "proprietors'" does not appear in the caption but it does appear in the constitution of this union, which is a part of the record.

[2] Article VIII, Section 5 (2) defines proprietor barber as follows: "A proprietor barber or beautician is defined as an owner or part owner of a shop, who habitually works with the tools of the trade." As to such proprietor barbers Article VIII, Section 3, provides: "Proprietor barbers or beauticians who are working with the tools of the trade and who do not employ one or more journeymen barbers or beauticians must become proprietor members of the local union to display the Union Shop Card."

journeymen barbers,[3] and employer barbers.[4] Proprietor barbers and journeymen barbers (which are the two classes material here) are both eligible to join the union.[5]

Local No. 9 is a local of the International Union and Louis J. Grimaldi is a proprietor barber and therefore eligible to join the union. The conclusion of the majority to the contrary is not justified.

The court below found that approximately 400 proprietor barbers working in the Philadelphia area are members of the union and that they constitute half of the total force of union barbers in Philadelphia.

In February, 1955, Local 9 began an organizing drive and in the course of it Grimaldi was asked to join the union.[6] Other meetings were held at each of which union representatives reiterated their request to Grimaldi to join the union. In the meantime, other similarly situated proprietor-barbers had been joining. At a meeting in April, Vincent Pace, an International Rep-

---

[3] Article VIII, Section 5 (1) defines journeymen barber, as follows: "A journeyman barber or beautician is defined as a qualified employee barber or beautician who works with the tools of the trade, and is not an owner or part owner of a shop where one or more journeymen barbers or beauticians are employed full time."

[4] Article VIII, Section 5 (3) defines employer barber as follows: "An employer barber or beautician is defined as an owner, or part owners of a shop wherein one or more journeymen barbers or beauticians are employed full time."

[5] Article VIII, Section 5 (9) provides: "Any barber or beautician, journeyman, proprietor or employer, who works at the trade, and who is otherwise qualified, is eligible to membership in any local union, and all members are entitled to equal rights of membership, including the right to vote and hold office."

[6] He is one of the secretaries of the Pennsylvania League of Master Barbers but the Constitution of that League does not prohibit its members from also joining the union. Consequently, a large number of its members are members of Local 9.

resentative, did speak vulgarly and slightingly of the League and threatened to picket Grimaldi. However, Grimaldi's witnesses described some of these meetings as "amicable" although undoubtedly Pace was at times angry and contemptuous. Finally, having failed to persuade Grimaldi to join the union, two pickets commenced to walk up and down in front of his place of business carrying a sign containing a true statement.[7] As a result thereof plaintiff's business was harmed. The court below found "Picketing was at all times conducted peacefully in an attempt to persuade the plaintiff to join the union and to publicize the fact that he ran a non-union barber shop." Nevertheless the court below enjoined the local and other named defendants from (a) setting up or maintaining a picket line at plaintiff's place of business; (b) interfering in any way with the operation of plaintiff's business; (c) intimidating or attempting to intimidate or coerce any of plaintiff's customers or suppliers or otherwise interfering with plaintiff or his business. The question which immediately arises is whether this injuction is proscribed by the Labor Anti-Injunction Act of June 2, 1937, P.L. 1198, 43 P.S. §206a et seq. That act withdraws jurisdiction from all courts of the Commonwealth to issue any restraining order or injunction which is "contrary to the public policy declared in this act" as well as any "case included within this act", Act of June 2, 1937, P.L. 1198, §4 as amended. The public policy provision of the act while guaranteeing to every worker freedom "to decline to associate with his fellows" also guarantees that such workers have the right to engage in "self-organization or in other concerted activities for the purpose of collective bargaining or

---

[7] The legend on the picket signs said: "Patronize Barber Shops That Display This Card—AF of L—C.I.O." "This Shop Does Not Display Union Shop Card of AF of L—C.I.O."

*other mutual aid or protection"*. Since this act prevents the issuance of injunctions in *labor disputes* it is important to remember that the act specifically provides in Section three, "a *person* or *association* shall be held to be a *person* participating or interested in a labor dispute if relief is sought against *him* or *it,* and if *he* or *it* is engaged in the same industry, craft or occupation in which such dispute occurs or has a direct or indirect interest therein. . ." The majority opinion bases its conclusion, at least in part, upon the assertion that Grimaldi is neither an employer or an employee; and the word "persons" as used in a separate section of the act [8] is plural. But it is to be noticed at once that in order for a labor dispute to exist it is not necessary that Grimaldi be either an employer or an employee; he need be only a person engaged in the same industry, trade, craft or occupation as the other disputant. The majority says "It will be noted that the statute uses the plural throughout. It speaks of 'persons,' of 'employes,' and of 'members.' But there are no persons, employes or members in Grimaldi's shop. There is only one person there—and no employes or members at all." The majority seems to be of opinion that it requires more than one person on each side of the dispute. This quite clearly is not so. No one would seriously contend that a dispute between one employer and one employee would not constitute a labor dispute. (See 43 PS §206c(b).) It seems to me that there is a labor dispute here within the meaning of the Labor Anti-Injunction Act. Certainly Grimaldi is engaged in

---

[8] "(a) A case shall be held to involve or to grow out of a labor dispute when the case involves *persons* who are engaged in a single industry, trade, craft or occupation, or have direct or indirect interests therein, or who are *employes* of the same employer, or who are *members* of the same or an affiliated organization of employers or employes . . ." (Emphasis supplied by the majority opinion.)

the same trade, craft and occupation and has the same indirect interest therein as the journeymen barbers who are members of this union. What happens in this craft or occupation, at least indirectly, affects both Grimaldi and the journeymen barbers. But even if this were not so certainly Grimaldi's position is identical with the approximately 400 proprietor-barbers who are members of the union. Whatever might be said as to the differences that may exist as between journeymen barbers and proprietor-barbers is not applicable between one proprietor-barber and another proprietor-barber. It must be conceded that Grimaldi performs exactly the same duties and is engaged in the same occupation as any barber in any barber shop anywhere. He must be licensed like all other barbers; he has the same economic interests and belongs to the same economic group as all other barbers. This dispute between Grimaldi and the union has economic repercussions upon the wages, hours of work and working conditions of all individuals in the industry and particularly upon the many journeymen barbers and proprietor barbers who are members of the union. Hence the union has a legitimate economic interest in peacefully persuading Grimaldi to join it and in advertising to the public that he is not a member.

In *Alliance Auto Service, Inc. v. Cohen,* 341 Pa. 283, 19 A. 2d 152, the union, which had a dispute with Petrol, picketed the plaintiff's service stations presumably because they purchased Petrol's products. This Court found that a "labor dispute" existed within the meaning of the Labor Anti-Injunction Act because of the "common interest" of the plaintiff and the defendants in the industry.

We also held that an outdoor movie theatre run entirely by members of a single family is subject to the Labor Anti-Injunction Act when involved in a labor

dispute even though no "employee" in the strict sense of the word was involved. *Warren v. Motion Picture and Machine Operators,* 383 Pa. 312, 118 A. 2d 168. In that case a corporation's attempt to discharge a union member and to have the work performed by a member of the family which owned the closed corporation was treated as giving rise to a labor dispute between the picketing union and the corporation.

The union has not forced Grimaldi through unlawful coercion or violence to join the union; they have simply insisted upon telling the public the true facts. If telling the truth about him caused Grimaldi to lose patronage, the loss is *damnum absque injuria.*

Time was when truth had an independent importance in our values regardless of who spoke it. Now it would seem that when truth is ineffectual because spoken by the humble, the oppressed, the minorities, it has constitutional significance but when spoken by the important, the powerful, or a labor union, it amounts to unlawful coercion. It seems quite clear, to me at least, that having told the truth about Grimaldi these defendants would not be subject even to damages for libel or slander. The truth is a defense in civil libel not because it does not hurt but because the injury inflicted by its telling will not be redressed by law. But the present case is the application of previous censorship even though under circumstances which would not warrant damages as a matter of postcensorship. There was a time when labor unions were weak and their organizing attempts were often futile. I agree that now that labor has become stronger it has a power to coerce. It must make us watchful to keep the balance even. But we go entirely too far when we condemn the telling of the truth by labor or anyone else no matter how powerful as being *unlawful* coercion. If there be an ultimate goal which the civilized enforcement of law

seeks always to reach it is the ascertaining of and enforcement of truth. It is because I think that this labor union had a legitimate interest in the affairs of Grimaldi that I think we have reached a wrong result.

He is not an employer and hence the picketing is not for the purpose of having an employer coerce his employees to join the union. As I have noted above, it is immaterial that he is not an employee. It is quite clear that had he been an employee then there would have been no pretense that the union could have been enjoined from picketing for the purpose of persuading him to join the union. *Sansom House Enterprises v. Waiters and Waitresses Union*, 382 Pa. 476, 115 A. 2d 746. This is true because the union employees have an identical interest with that of non-union employees in the wages, hours and working conditions of the same craft. It does not seem to me that this principle becomes inapplicable because Grimaldi is a proprietor barber in view of the fact that there are 400 such proprietor barbers in the union.

Indeed, I believe that the injunction actually issued by the court below, in the light of the facts of this case, is a violation of the rights of defendants under Article I, Section 7 of the Pennsylvania Constitution, independently of the Labor Anti-Injunction Act. *Kirmse v. Adler,* 311 Pa. 78, 166 Atl. 566; *Friedman v. Blumberg,* 342 Pa. 387, 23 A. 2d 412; *Penna. Labor Relations Board v. Bartenders Union,* 361 Pa. 246, 64 A. 2d 834; *Wilkes Sportswear, Inc. v. Int. Ladies Garment Workers Union,* 380 Pa. 164, 110 A. 2d 418. In *Schwartz et al. v. Laundry and Linen Supply Drivers' Union, Local 187,* 339 Pa. 353, 14 A. 2d 438, generally referred to as the "bob-tail" case, plaintiffs brought suit against the union and the laundries in the City of Philadelphia to have declared illegal the provisions of the collective bargaining agreement between them

which prohibited the laundries from accepting work from any "bob-tail" who was not a member of the union or who did not have a contract with it, and which prescribed the prices which the "bob-tails" were to charge for their services and also imposed certain limitations upon the sale by "bob-tails" of their businesses. This Court, in an opinion by Mr. Justice STERN, found that the provisions of the contract relating to the prices which "bob-tails" were to charge and relating to the sale of a business by "bob-tails" were illegal as an unjustifiable restraint of trade. This Court ordered that an injunction be entered restraining the enforcement of these provisions of the contract *except as to those provisions requiring plaintiffs, the "independent business men," to become members of the union.*

In regard to the provision requiring the "bob-tails" to become members of the union, this Court recognized the importance to the union of restricting the hours and working conditions of the "bob-tails" in order to avoid the lowering of the working standards of those who were already represented by the union. The opinion states: "It is somewhat difficult to understand what such membership is intended to accomplish. Insofar as it is designed to restrict the 'bob-tails' in the operation of the trucks which they themselves drive, and in their collection of laundry, to hours and working conditions prescribed by the union and embodied in its agreement with the laundry companies, *the union has a legitimate interest in thus seeking to protect the laundry employees against the lowering of working standards on the part of those who themselves, although in a different legal capacity, perform to some extent the same kind of labor.* So far, therefore, as a 'bob-tail', by becoming a member of the union, would be bound by its reasonable rules as to such matters, there would seem to be no valid objection to this provision." (Emphasis supplied.)

The holding of the *Schwartz* case thus establishes that there is no public policy of this Commonwealth preventing a labor union from organizing the so-called "independent business men". This right is based on the direct connection between the income, working conditions and hours of work of the owner-operator or the self-employer and the wage rates, working conditions and hours of work of the union members.

In *Cafeteria Employees Union v. Angelos,* 320 U.S. 293, a labor union picketed a cafeteria which was owned by several individuals who themselves conducted the business without the aid of any employees. The Supreme Court reversed the Court of Appeals of New York and found that picketing of an owner-operated business which had no employees was constitutionally protected as an exercise of the right of free speech.

In *International Brotherhood of Teamsters, Local 309 v. Hanke,* 339 U.S. 470, the union picketed the plaintiff's business which was owned and operated by him and his three sons as co-partners. Plaintiffs had no employees, but ran their business by themselves. The union picketed their place of business in order to persuade them to respect the limitation on business hours in the collective bargaining agreement between the union and other employers in the same industry. The action of the Supreme Court of Washington in concluding that such picketing violated the public policy of the State of Washington was not condemned. The Supreme Court so concluded solely on the basis that it ought not to interfere within the domain of a state's public policy; but there is no such policy in Pennsylvania. *Schwartz v. Laundry & Linen Drivers' Union,* supra.

In the leading case of *Coons v. Journeymen Barbers, Hairdressers and Cosmetologists Int. Union,* 222 Minn. 100, 23 N.W. 2d 345, the plaintiff was the operator of

a one man barber shop which was picketed by the defendant union for the purpose of inducing him to join the union. The signs used by the union were the same as the signs used in the present case. The Supreme Court of Minnesota stated: "Decisions holding that peaceful picketing for the purpose of inducing one operating a business without employes to join a union recognize both the right of a person to operate his business without employes and without joining a union, and the right of a union, in the exercise of the constitutional right of freedom of speech secured to its members by the Fourteenth Amendment, to proclaim those facts for the purpose of influencing the public in their dealings with him, Naprawa v. Chicago Flat Janitors' Union, 315 Ill. App. 328, 43 N.E. 2d 198 (leave to appeal denied, 382 Ill. 124, 46 N.E. 2d 27); O'Neill v. Bldg. Service Employees Int'l Union, 9 Wash. 2d 507, 115 P. 2d 622, 137 A.L.R. 1102."

In the recent case of *Journeymen Barbers, Hairdressers and Cosmetologists Int'l Union, Local 687 v. Pollino*, 22 N.J. 389, 126 A. 2d 194 (1956), the Supreme Court of New Jersey held that the plaintiff barbers' union was entitled to replevy its union shop card displayed in defendants' barber shop at the expiration of the collective bargaining agreement where no new contract was executed primarily because the *proprietor working barber* (even though he employed others) rejected the union demand that he become a member of the union. The Court said: ". . . support may be found in the cases for the union's view that (absent restrictive legislation) there is no general public policy against a requirement that employers, who actually work with the tools of their trade alongside their employees, must become members of the union and support it at least to the extent that their interests coincide."

I further believe that the conduct of the union is protected by the Fourteenth Amendment to the Constitution of the United States. It is still the law that a *blanket* prohibition against all forms of peaceful picketing is a violation of the Fourteenth Amendment. This is recognized even in *International Brotherhood of Teamsters, Local 695 v. Vogt*, 354 U.S. 284, the most stringent of all the recent cases. Starting with *Thornhill v. Alabama*, 310 U.S. 88, the Supreme Court of the United States first enunciated the doctrine that picketing is constitutionally protected as an exercise of the right of free speech and this doctrine was further expanded even where a direct employer-employee relationship was not involved. *American Federation of Labor v. Swing*, 312 U.S. 321. In *Bakery and Pastry Drivers v. Wohl*, 315 U.S. 769, it was held that New York could not constitutionally prohibit a union from picketing bakeries in an effort to have independent peddlers, who bought from the bakeries, conform to union standards. The common impression, however, is that *Thornhill* and *Swing* were rendered virtually innocuous by *Vogt*. If anything need be said outside of *Vogt* itself to demonstrate that this is not so it would be found in the recent decision reversing the decision of the Supreme Court of Kansas in *Newell v. Chauffeurs Teamsters Local 795*, 181 Kan. 898, 317 P. 2d 817. There the Supreme Court of Kansas held that the picketing was coercion simply because it was aimed at the strangulation of the employer's business for the purpose of hastening the employer's recognition of the union's demands. The Court said "Coercive picketing is unlawful and contrary to the public policy expressed by the legislature of Kansas". In reversing, 356 U.S. 341, the Supreme Court of the United States said "PER CURIAM— The petition for writ of certiorari is granted and the judgment of the Supreme Court of Kansas is reversed. Thornhill v. Alabama, 310 U.S. 88, 98."

By way of summary, then, it would appear that a state court can, so far as the Federal Constitution is concerned, enjoin picketing in a particular case if the picketing has an objective which violates the legitimate public policy of a state. However, a state may not issue a blanket injunction against all picketing. Nor may a state constitutionally equate picketing itself with coercion or with a violation of state policy. Organizational purposes are always a proper objective of picketing and hence picketing for such purposes is constitutionally protected and cannot be enjoined by a state.

The record more than adequately supports the finding that the picketing here had as its purpose the peaceful inducement of the plaintiff to join the union. The plaintiff testified that the union representative "wanted me to join the Union". There is absolutely no dispute in this case as to the sole object of the union's conduct, that of persuading the plaintiff to join the union. The picketing consisted only of two men walking up and down in front of plaintiff's barber shop. There was admittedly no violence, no threats contemporaneous with the picketing. Yet the chancellor and the court below labeled this picketing "coercive". The *chancellor* found that the picketing constituted "coercion" because it was aimed at securing plaintiff's membership in the defendant union.

The *court below* in its opinion on the defendant's exceptions conceded that the purpose of the picketing was organizational and in the same breath declared that its purpose was unlawful: "The immediate purpose of this picketing is to organize a self-employed barber who has no employes. The actual purpose, however, appears to be union control of prices and hours of all the City's barber shops by completely organizing the trade. Such is not a legitimate union objective and constitutes an unlawful purpose."

It is impossible not to conclude that the court below equated peaceful picketing for organizational and advertising purposes with coercion. That is precisely what we have said times without number it may not do. It amounts to a blanket proscription of all peaceful picketing. There was no evidence of intent to control prices.

It seems to me that the broad sweeping injunction in this case would prevent the union even from passing out pamphlets describing the status of its relation to Grimaldi or even standing on street corners away from Grimaldi's premises to tell the truth about him. I do not believe that Mr. Grimaldi is *sui generis*. He is not anarchic like Robinson Crusoe before the coming of Friday. For the same reason that the rights of the union and its membership are not absolute neither are Grimaldi's. A proper accommodation of both, in my view, would require us to reverse this decree.

Hence, I dissent.

Mr. Justice COHEN joins in this dissenting opinion.