## Commonwealth v. Millhouse

*A. B. Johnson,* for Commonwealth.

*S. Schwarz,* for defendants.

WEINROTT, J., July 29, 1964. — In a demonstration against alleged de facto segregation last February 5th, six men and six women lined up abreast in front of the entrance to a Philadelphia school annex and prevented pupils from returning to their classes. Two magistrates held them for court on a charge of breach of the peace, two of them twice for repeating the demonstration the next day.

Contending that Pennsylvania recognizes no such crime as breach of the peace, and that, in no event, was a prima facie case made out against them, the 12 defendants declined to enter bail, were committed, and filed 14 petitions for writs of habeas corpus. The question before the court is the disposition of those writs.

The site of the occurrence was the Gaston Presbyterian Church at Eleventh and Lehigh Avenue, Philadelphia, which the Board of Public Education rented to house an overflow from the virtually all Negro Clymer Elementary School. Protesting groups seeking integration had asked the board, without tangible result, to transport the overflow by bus to a predominantly white school which had space available. The picketing, shortly before 1 p.m. was orderly; but someone other than anyone among defendants did push and frighten a child, perhaps accidentally, and two parents who accompanied their children testified that they were apprehensive. Some 50 or 75 onlookers gathered around. Police asked the pickets to disperse and, on their refusal, arrested the 12 defendants. The complaint charged them with "blocking children from entering school." It remains to be added merely that according to recent information the school board has decided to abandon further use of the church as an annex and to transfer the excess pupils of Clymer elsewhere.

First, we will dispose of a preliminary consideration, the adequacy of the complaint. Contrary to the contention of relators, the complaint was sufficient. A complaint need not be as particular as an indictment. It is adequate if it states a criminal offense and informs defendant of the charge, its general nature and the time and place of the act charged: Commonwealth ex rel. Garland v. Ashe, 344 Pa. 407, 26 A. 2d 190 (1942); Commonwealth ex rel. Jenkins v. Costello, 141 Pa. Superior Ct. 183, 14 A. 2d 567 (1940).

The Penal Code of Pennsylvania, Act of June 24, 1939, P. L. 872, 18 PS §4101, et seq., contains no such specific crime as "breach of the peace." It does list a number of crimes under the general heading, "Offenses against the Public Peace": Article IV, secs. 401-19, as amended, 18 PS §4401-19. They include unlawful assemblies, disturbing public assemblies, disorderly con-

duct and a number of others. Section 1101, 18 PS §5101, however, is a catch-all which preserves all existing common law, and statutory, offenses "not specifically provided for by this act."

Blackstone, in book IV, chap. 11, of his Commentaries (Sharswood ed. 1874, vol. 2, pp. 424, et seq.; Ehrlich's Blackstone 1959, pp. 808 et seq.), lists 13 offenses against the public peace", including, among others, riotous assemblies of 12 persons or more, riots, routs and unláwful assemblies of three or more, and tumultuous petitioning. Some are similar to our statutory provisions.

Text writers concede, as argued by counsel for relators, that, in some quarters, "breach of the peace" is deemed merely generic and not of itself a crime eo nomine. But they add that nevertheless the common law did recognize a specific crime of that name, which in some States is now statutory: 2 Wharton's Criminal Law and Procedure, Anderson revision 1957, 655-56; Perkins, Criminal Law (1957) 341; 1 Restatement, Torts 246, § 116.

In Pennsylvania, the offense is expressly stated to be "well known at common law" and is defined as "a disturbance of public order by an act of violence or one likely to produce violence or which, by causing consternation and alarm, disturbs the peace and quiet of the community": Commonwealth v. Sherman, 14 D. & C. 4, 12 (Q. S. of Phila., 1930). In that case, however, staging a baseball game on Sunday, despite the attendant noise, was held neither a breach of the peace nor disorderly conduct.

Repeating the definition is United States v. Kessler, 213 F. 2d. 53, 56 (3rd Cir., 1954), in which peaceful picketing during a strike was held not to be a violation. The Pennsylvania Law Encyclopedia also adopts the definition: 5 P. L. Encyc. "Breach of the Peace", §1. p. 606.

No Pennsylvania case matches on its facts precisely the conduct involved in the instant matter, the blockading of a school against entry by pupils. The district attorney's office has found an isolated Rhode Island case, in which a woman entering a schoolhouse and locking out teachers and pupils was held guilty of a breach of the peace: Douglass v. Barber, 18 R. I. 459, 28 Atl. 805 (1894). We have discovered a North Carolina case to the direct contrary: State v. Spray, 113 N. C. 686, 18 S. E. 700 (1893).

Those cases, both of approximately the same vintage, actually arose under statutes forbidding anyone to interrupt or disturb a school. They lead us to examine some types of offense analogous to breach of the peace. Such an examination is not precluded by the action of the magistrates in holding these relators for breach of the peace. The complaint, as already mentioned, did not denominate the crime charged, but merely recited the facts. The name given an offense is unimportant; an act may be indictable even though it has no name: Commonwealth ex rel. Lord v. Sherman, 34 Erie 27 (1951). At common law, all offenses especially affecting society are indictable whether found in the books or not: Commonwealth v. Weiner, 49 Dauph. 428 (1941).

Disturbing an assembly is a misdemeanor both by our statute (Penal Code, loc. cit., §405, 18 PS §4405) and at common law: Campbell v. Commonwealth, 59 Pa. 266 (1868). However, the assembly must actually have convened: Commonwealth v. Underkoffer, 11 Pa. C.C. 589, 1 Dist. R. 676 (1892). In the instant case, the children were merely seeking to assemble within the school but had not yet done so.

' Disorderly conduct, by our statutory definition, requires a "loud, boisterous and unseemly noise or disturbance": Penal Code, loc. cit., §406, 18 PS §4406. The district attorney's office concedes that the relators

were not disorderly and the evidence supports the con-- cession.

"Riot, rout, unlawful assembly or affray", a misdemeanor under section 401 of the Penal Code, 18 PS §4401, is not defined in the code. The acts listed constitute a combination offense: Commonwealth v. Duitch, 165 Pa. Superior St. 187, 67 A. 2d 821 (1949) ; but disorder is an essential concomitant: Commonwealth v. Ray, 177 Pa. Superior Ct. 154, 110 A. 2d 764 (1955) ; Commonwealth v. Stein, 44 Lanc. 637 (1935).

Picketing in itself, if orderly and for a lawful purpose, is permissible even if no labor dispute is involved: 1621, Inc. v. Wilson, 402 Pa. 94, 166 A. 2d 271, 93 A. L. R. 2d 1274 (1960); Individual Retail Store Owners Assn. v. Penn Treaty Food Stores Assn., 33 D. & C. 100 (1938). But, picketing for an unlawful purpose will be enjoined: Grimaldi v. Local No. 9, 397 Pa. 1, 153 A. 2d 214 (1959).

Was the purpose of the relators in the case at bar unlawful?

The Public School Code of March 10, 1949, P. L. 30, 24 PS §1-101, et seq., provides, inter alia, for compulsory attendance, and declares that a person in parental relation who violates that requirement shall be fined: Act, sec. 1327, as amended, id. §1333, 24 PS §13-1327, 13-1333. The act does not refer to violation by third persons; but it would seem surely to be a violation of the State's public policy for outsiders to prevent children from attending school.

However, the picketing cases cited above involved the issuance of injunctions and not the existence of crimes. Whether or not defendant might have been enjoined, we need not decide; but even though under the common-law principles cited above we might declare certain conduct a crime, even though not found in the books, holding the brief interference of these relators with the pupils' attendance a crime is quite

a different matter from issuing an injunction against them.

Their underlying purpose, we realize, was one far beyond an interference with school attendance. It was to protest against what they considered de facto segregation. Ten years ago, in an epochal decision, the United States Supreme Court declared illegal a State's deliberate policy of racial segregation in public schools: Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S. Ct. 686 (1954). But that landmark decision implied that, while deliberate segregation was illegal, a natural grouping of children on a residential basis was not. Expressly so holding is Sealy v. Department of Public Instruction of Pennsylvania, 252 F. 2d 898, 901 (3rd Cir., 1958), certiorari denied 356 U.S. 975, 78 S. Ct. 1139 (1958).

No evidence has been adduced of any deliberate segregation in the Philadelphia schools. We are judicially unaware of any such policy, and we do not believe it exists. On that basis, we might declare the purpose of the picketing here unlawful. We still have the question whether the belief of the relators that de facto segregation existed, even though not deliberate, justified their protest. We also have the factor that, even though it might be unjustified, their picketing, while perhaps subject to an injunction, did not thereby necessarily become criminal.

In the recent "sit-in" cases our Nation's Supreme Court has displayed a highly tolerant attitude. Even in cases where the State court expressly found the existence of disorder, our highest tribunal reversed the finding and declared no breach of the peace existed: Garner v. Louisiana, 368 U.S. 157, 82 S. Ct. 248 (1961); Wright v. Georgia, 373 U.S. 284, 83 S. Ct. 1240 (1963).

Likewise, civil rights demonstrations found locally to be boisterous, noisy and conducive to violence, have been held not to be breaches of the peace: Edwards v.

South Carolina, 372 U.S. 229, 83 S. Ct. 680 (1963) ; Henry v. City of Rock Hill, 376 U.S. 776, 84 S. Ct. 1042 (1964).

The Supreme Court, however, has not uniformly been so liberal. In a 1951 case, a man who urged Negroes publicly to rise up in arms and fight for their rights, thereby stirring some hearers to threats of violence, was held guilty of a breach of the peace: Feiner v. People of State of New York, 340 U.S. 315, 71 S. Ct. 303 (1951).

And a recent case, apparently not yet available in a full report but summarized in 32 U.S. Law Week, at page 3010, is difficult to understand. The Louisiana Supreme Court held an inflammatory speech by a Negro to students a statutory breach of the peace. On May 27, 1963, the United States Supreme Court granted a certiorari. Nine months later, on February 24, 1964, the court, with no explanation whatever, dismissed the writ "as improvidently granted": Diamond v. Louisiana, 373 U.S. 931, 83 S. Ct. 1537 (granting certiorari) ; 376 U.S. 201, 84 S. Ct. 696 (dismissing it). The dismissal may indicate that our Nation's highest court does not regard freedom of expression as unbounded.

Nevertheless, that court has expressed with sufficient definiteness, though sometimes with vigorous dissent, its view that the freedoms of speech, peaceable assembly and petition for redress of grievances, added to the Constitution by the first amendment and guaranteed by the fourteenth against incursion by the States, override at least doubtful considerations of breach of the peace and allied misdemeanors. In the case at bar, though some slight evidence of minor disorder, "consternation and alarm," and possible incitement of disturbance existed, and though we have been impelled to canvass various possibilities, we are constrained to follow the decisions cited and to rule the evidence in-

sufficient to make out a prima facie case of breach of the peace or any other crime.

In conclusion, it is our absolute understanding that the Board of Public Education has definitely concluded that the housing of public school classes in the Gaston Presbyterian Church at Eleventh Street and Lehigh Avenue be terminated as of June 23, 1964. This is coupled with the fact that arrangements have been made to place pupils from the Clymer School, including those who had been housed at the Gaston Church, for whom rooms will not be available at the Clymer School in underutilized public school buildings. Under the circumstances, we believe and hope that the current dispute will be rendered moot.

We now order that the relators be discharged on all writs of habeas corpus, and that any and all bonds which were filed are hereby terminated.