## Scotties, Ltd., v. Street

*Thomas R. Bond,* for plaintiffs.
*Germaine Ingram,* for defendants.

SPORKIN, *J.,* May 1, 1974 — This case is before us on a rule for preliminary injunction, filed by plaintiffs, who are the tenants of premises in the 1100 block of Market Street, Philadelphia, Pa., and who operate such premises as commercial stores at the following locations:

Scotties, Ltd., 1104 Market Street

Brandts Jewelry Stores, Inc., Market Street, 1106 Market St.

S. H. Kress of Girard Square, Inc., 1108-14 Market St.

Shoe Realty Corp., t/a Dial Shoes, 1128-30 Market St.

Phila. Fifth Avenue Cards, Inc., 1132-34 Market St.

Herbert Bobman Department Store, Co., t/a Carlton Mens Shop, 12-22 S. 11th Street

(Plaintiffs will hereinafter be referred to as "merchants".)

Defendants are Milton Street, a resident of Philadelphia, individually and as president of the Black Vendors Association of Philadelphia, also known as Black Merchants Association. (Defendants will hereinafter be referred to as "vendors".)

The complaint in equity alleges that:

(1) Vendors began picketing and leafleting in front of merchants' stores on or before April 10, 1974, and have continued to do so since that date.

(2) Vendors and others picketing in their behalf and at their direction, have disseminated "a con-

tinuous stream of derogatory remarks, threats and intimidations" on a portable loud speaker, which remarks were aimed at merchants, their agents, supervisors, employes, patrons, and at passersby.

(3) That such remarks, together with the information in the leaflets distributed by vendors and their agents, contained false statements or accusations concerning merchants, and attempted to provoke racial disturbance and unrest.

(4) The vendors and their agents have coordinated this course of speech and leafleting with threats or acts of physical coercion designed to impede ingress and egress to the merchants' stores.

On April 22, 1974, following an ex parte hearing, Hirsh, *J.,* issued a preliminary injunction order upon security entered by plaintiffs in the sum of $500, enjoining and restraining vendors from

(a) "directly or indirectly, or by any pretext, continuing the so-called strike, against the plaintiffs' employes or any of them or otherwise interfering with the operation of plaintiffs' business at the locations herein set forth, Philadelphia, Pa., or elsewhere or with the employment of the plaintiffs' employes or any of them;"

(b) "directly or indirectly picketing, boycotting or advising, instructing or encouraging others to picket or boycott the plaintiffs, their employes, their customers on the business premises of the plaintiffs and/or its customers or others doing business with it"; and

(c) "their threatening, molesting or abusing, insulting, assaulting or advising, striking or encouraging others, threaten, molest, and abuse, insult or assault plaintiffs, its officers, agents or employes or any other person for their refusal to participate in the said picket in connection there-

with or for dealing, or doing business with plaintiffs or the plaintiffs' employes."

The order further set April 24, 1974, at 10:00 a.m. as the time of the hearing of the merchants' motion to continue the injunction, and the case was assigned to this court for further disposition. On that date, vendors appeared and, by their counsel requested the court to dissolve the preliminary injunction as having been granted ex parte and without notice to the vendors, despite availability of the vendors for service of process, and additionally moved that the preliminary injunction be dissolved or modified on the grounds that it is overbroad and improper as a matter of law. We refused the former motion, and went forward to hear additional testimony as to the latter motion to dissolve or modify the preliminary injunction.[1] Upon consideration of the testimony adduced, of the briefs and of the arguments of counsel, we believe that the preliminary injunction must be modified.[2]

## FACTS

1. The merchants operate as lessees under leases with the property owner, the trust of Stephen Girard, deceased (the trust).

[1] May 15, 1974, at 10:00 a.m. in room 1201, Five Penn Center Plaza Building has been set as the time and place of the hearing on the merchants' prayer for permanent relief.

[2] Although Pa.R.C.P. 1531 minimally requires this court to issue a *decree* in such a case, with a memorandum of law only required five days after issuance of a final injunctive decision, we believe that due to the intensity of emotion involved in the present circumstances, and due to the complicated legal issues here involved, any decree issued by this court should be defined and clarified by a statement of the legal principles by which we feel ourselves to be bound, and which underly the decree.

2. In late 1973 the City of Philadelphia, as trustee under the will of Stephen Girard, instituted an action in equity seeking to enjoin the operation of a large food stand by Milton Street (Street), which was maintained by him on the sidewalk abutting land owned by the trust at Eleventh Street between Girard and Clover Streets, in Philadelphia, where the Community College of Philadelphia is presently located.

3. In an opinion and order, dated January 8, 1974, this court found Street's operation to constitute a trespass and enjoined Street from further maintaining his stand in front of the Community College. Street was not represented by counsel, and filed no exceptions to the order.

4. There are presently certain other sidewalk stands being operated on the Eleventh Street sidewalks, abutting property owned by the trust. These stands are being operated by members of the vendors.

5. On March 12, 1974, the City of Philadelphia, as trustee under the will of Stephen Girard, filed a complaint in equity seeking to enjoin maintenance or operation of these other stands (March term, 1974, no. 1946). (This suit is also referred to in paragraph 7, infra.)

6. On April 8, 1974, Street distributed to the merchants a form letter from the vendors, stating that the vendors had met with Mr. Kent Roberts, who is general manager of the City of Philadelphia as trustee under the will of Stephen Girard, and that the vendors had discussed with Mr. Roberts the reason for the city's decision to bring the suit in paragraph 5, supra. The letter further states that:

". . . We were informed at that meeting that there was so much pressure being placed upon the shoul-

ders of Mr. Roberts by the tenants [meaning the merchants] that he had no alternative but to seek legal action through the courts to have the brothers and sisters enjoined.

"It is because of the pressure that you [the merchants] as a tenant have put on Mr. Roberts that we will be calling for a mass boycott of your store beginning Wednesday morning April 10th, 1974 . . ."

7. On April 9, 1974, this court entered a rule to show cause why the relief sought in the suit referred to in paragraph 5 should not be granted. The rule was made returnable for April 19, 1974, in court room 1201, Five Penn Center Plaza Building, at 10:00 o'clock a.m. On that date, the named defendant in such action, The African Institute of Learning, appeared but were not represented by counsel, and the case was therefore continued to May 2, 1974, in order to afford an opportunity of said defendant to retain counsel.

8. On Wednesday, April 10, 1974, the vendors established a picket line in front of the merchants' stores.

9. In the course of their picketing, the vendors and their agents have used bullhorns to amplify their statements, which bullhorns, when directed in the faces of passersby or when directed into the vestibule area in front of the store, so amplify the sound produced as to frighten, unduly disturb, and otherwise amount to a nuisance with respect to the public and patrons of the merchants.

10. The picketers have also distributed leaflets, which urge pedestrians to boycott the following stores (naming those stores operated by the merchants), and alleging that such stores are "taking legal action to permanently remove the BLACK vendor from center city. They are taking us to court

on Friday, April 19, 5 Penn Plaza, court room 1201, 16th and Market at 10:00 a.m." The leaflet further posed the question, "If the white pretzel man, the white hot dog man, the white fruit man, and the white paperman, can vend in center city, WHY CAN'T BLACK VENDORS SELL IN CENTER CITY?"

11. In distributing the leaflets, the picketers on several occasions stood at or adjacent to the entrance of one of the merchants' stores and reached across the entrance way, holding the leaflet out to a potential patron, such that the patron would have to force his or her way past the arm of the picketer in order to gain ingress to the store.

12. On several occasions, when the patron ignored the pleas of the picketers to boycott an establishment, and made his or her way into the store, one of the picketers directed the bullhorn into the entrance of the store and shouted at such patron not to betray the picketers, continuously pleading with him or her to leave the store and return to the sidewalk.

13. In at least one instance, a picketer grabbed a woman customer of one of the merchants, while holding her arm, strongly urged her not to enter the store. In that instance, however, the patron entered the store nonetheless.

14. In one instance, when one of the picketers shouted through the bullhorn at a patron who had ignored their protestations and had entered the store, said patron put down the merchandise she was sampling and left the establishment.

15. In one instance, one employe of one of the merchants, at whom verbal pressure was directed seeking to have her support the picketers, became upset and terminated her employment at the establishment.

## DISCUSSION OF LAW

Our threshold inquiry in this discussion must be whether *any* picketing by the vendors against the merchants is justified. The vendors assert that the picketing here is protected by constitutional guarantees of freedom of expression. The test in "free speech" cases has been defined by our Pennsylvania Supreme Court in 1621, Inc. v. Wilson, 402 Pa. 94, 104-105, 166 A. 2d 271, 276 (1960), wherein the court stated that "[T]he United States Supreme Court has evolved a doctrine whereby a state may, consistent with the Federal Constitution, enjoin picketing which in a particular case has an *objective* which violates a legitimate clearly-defined law or public *policy* of the state." (Emphasis added.)

As noted heretofore, the central objective of the picketers in this case is to bring about a cessation of what *they* perceive to be a series of complaints by the merchants to the lessor (the trust), seeking to have the vendors removed from their present location. The city, as trustee for the trust, has instituted proceedings in equity to enjoin the vendors from operating their stands (referred to supra, in paragraph 5 of our findings of fact). This suit to enjoin the vendors' *operation* of their stands has not yet been resolved, and we believe that *unless or until a court found the vendors' operations to be improper,* picketing by the vendors to gain continued operation of the stands contravenes *no* public policy of the State. Thus, until the question of the vendors' right to *operate* is resolved, we believe that peaceful picketing by the vendors, aimed at convincing the lessees to withdraw their objections to the vendors' operations near the leased property, is not per se illegal or improper.

Turning now to the question of whether the picketing is improper *as it has actually been effectuated,* the merchants allege, in support of their prayer for injunctive relief, that: (1) the pickets are disseminating false and harmful statements about the merchants; and (2) the vendors are engaging in more than simply speech—they are physically obstructing ingress and egress to the stores operated by the merchants and are verbally threatening potential customers.[3] Thus, the broad statement of the prayer of the merchants is that (a) the *content* and (b) the *manner* of the picketing should be restrained. We believe that, absent a finding at law that the statements are libelous, a court of equity

---

3. The merchants also urge that the picketers' real grievance is with the city, as trustee for the trust (lessor herein), which is the source of the attempts to remove the vendors' stands, and that the vendors have *no* real complaint against the merchants. The merchants contend that, absent such a "grievance nexus" with the operator of the establishment, the vendors have no legal right to picket against that merchant. We do not agree with such argument, advanced by the merchants, for it would place the burden on demonstrators to first prove the truth of their statements or the righteousness of their cause which, as will be discussed infra, is the precise reverse of the proper burden in "freedom of expression" cases. We refrain from further treating the "grievance nexus" theory of the merchants, however, because we have also found that in fact such a nexus *did* exist, in the good faith perception of the vendors that the true *initiative* for the lessor's efforts to remove the stands of the vendors was a series of complaints from the *merchants*. As noted in 1621, Inc. v. Wilson (n.6), supra, picketing decisions are now rendered upon considerations associated with "free speech" doctrine rather than under tort theory, as in the past. Whereas *picketing* was formerly held to be illegal unless justified by the picketers, free speech doctrine considers *restraints* on picketing to be illegal unless justified. The burden of proof, under the modern cases, is on those seeking to limit picketing.

may only limit the manner of speech, and that attempts to regulate the *content* of the picketers' messages in this case would seriously abridge their first amendment rights guaranteed in our United States Constitution.

Taking first the question of whether this court may enjoin the *content* of the picketers' message, we are guided by the opinion of Mr. Chief Justice Burger, in Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S. Ct. 1575, 29 L. Ed. 2d 1 (1971). In Keefe, a "neighborhood betterment" organization picketed a business whose practices were disagreeable to the organization. The picketing was peaceful. The protestants also distributed leaflets in support of their cause.

The court, speaking through the chief justice, stated that:

"It is elementary, of course, that in a case of this kind the courts do not concern themselves with the truth or validity of the publication . . .

"This Court has often recognized that the activity of peaceful picketing is a form of communication protected by the First Amendment . . .

"Any prior restraint on expression comes to this Court with a 'heavy presumption' against its validity.": 402 U.S. at 419 (citations omitted).

This strong admonition against prior restraint, even of *false* statements, as expounded by Mr. Chief Justice Burger in Keefe, is repeated by 42 Am. Jur. 2d, Injunctions, §135, which provides in pertinent part that:

"*Section 135* . . . Equity does not have jurisdiction to act for the sole purpose of restraining the publication or utterance of a libel or slander, regardless of whether the defamation is personal, or

relates to a property right. Nor will a publication be enjoined merely because it is false, misleading, or amounts to nothing more than an expression of opinion . . .

". . . After a plaintiff has, *by a judgment at law* established the fact that certain published statements are libelous, he may, on a proper showing, have an injunction to restrain any further publication of the same or similar statements." (Citations omitted; emphasis added.)

Moreover, the efforts to enjoin the picketing here must be subjected to even closer scrutiny in the present posture of the case, for at this stage the merchants seek only *preliminary* relief. In order to gain such relief in Pennsylvania, a plaintiff must show that his right to relief is clear, that there is an urgent necessity to avoid injury which cannot be compensated for by damages, and must show that greater injury will be done by refusing it than by granting it: Sameric Corp. of Market St. v. Goss, 448 Pa. 497, 295 A. 2d 277 (1972).

Here, there has been *no* finding at law that the statements are libelous. The merchants allege that the leaflets distributed by the picketers, accusing the *merchants* of having "taken legal action to permanently remove the black vendor from center city," and referring to the proceedings to enjoin operation of the vendors' stands (which were, as stated, actually brought by the *city* as trustee for the lessor), raised the inference or innuendo of racism among the merchants, which innuendo is harmful to the business reputations of the merchants.

This claim by the merchants is exactly the kind of difficult question of libel which is most properly answered in an action at *law*, with the accompany-

ing right of the vendors to present their defense to a *jury.* It is plain to us that the merchants have failed to show that their right to relief is clear, as they must do to gain preliminary relief from the *content* of the declarations disseminated by the vendors.

Furthermore, as discussed earlier, a grant of preliminary relief to the merchants here would be, in effect, a prior restraint of free speech by the courts of Pennsylvania—a remedy to be granted under only the most extraordinary circumstances. There is no evidence of violence by the picketers, although they have impeded the free flow of traffic into and out of the merchants' stores. This wrongful conduct can be remedied by a court of equity without using the blunderbuss approach of enjoining the speech itself. Thus, in our view, the merchants, as respects their prayer for restraints against the *content* of the vendors' speech, have not demonstrated *either* that their right to relief is clear *or* that more harm will be done by refusing the prayer than by granting it. They have not carried their burden for preliminary relief against the *type* of statements made by the vendors, and that portion of the merchants' complaint for a preliminary injunction will be refused.

Although we do not find merit in the request by the merchants for this court to enjoin the *content* of the vendors' expression, we do believe it within the scope of our authority to regulate the *manner* or *conduct* by the picketers in distributing their information. The record discloses that, as noted previously, the vendors have stationed themselves and their agents, picketing in the vendors' behalf, directly at the entranceways to the merchants' establishments. In distributing their leaflets, the picket-

ers have stretched their arms across the entrances to the stores, thus obstructing the ingress or egress of pedestrian traffic at those stores. The vendors have also used bullhorns which, when used to amplify their broadcast message, have the effect also of severely disrupting the smooth flow of passersby on the sidewalks.[4] On some occasions, the pickets have grabbed potential customers and strongly urged them not to shop at the targeted establishments. On one occasion someone using one of the bullhorns shouted at a woman in one of the stores, threatening to snatch her package if she purchased at the establishment.

These may have been isolated instances, rather than a woven fabric of continuing conduct, but we are mindful that the underlying dispute here is built around elements of economic enterprise, of asserted property rights, and of race; and inherent in this package is the significant potential for explosion. We feel, therefore, especially impelled to act in restraint of these additional elements of conduct, such as the obstruction of entranceways and the physical handling of customers. We further conclude that although bullhorns may be permissible

---

4. The vendors testified that the need for this electronic amplification of their message arose when the Kress store (one of the merchants), which plays recorded music over loudspeakers directed into the street, so increased the volume of *its* broadcasts that the picketers' unamplified voices were partially drowned out. The record further shows, however, that the bullhorns were *improperly* used, in that they were directed into *stores* instead of toward sidewalk traffic. Moreover, the vendors used their bullhorns to continue shouting their boycott pleas to individual customers *inside* the stores (and therefore away from the portions of property dedicated to public use), who had entered despite the entreaties of the picketers on the sidewalks.

in some instances, where (as here) the bullhorns are used *improperly* on crowded urban sidewalks, a court in equity may, and should enjoin their further utilization.

In light of the foregoing discussion, then, we enter the following preliminary

## DECREE

And now, May 1, 1974, the special injunction order issued by Hirsh, *J.*, on April 22, 1974 is modified and amended as follows:

1. Defendants Milton Street, individually and as president of the Black Vendors Association of Philadelphia, also known as the Black Merchants Association, together with its agents, servants and those acting in its interest or at its direction, are enjoined and restrained temporarily, until final hearing, and thereafter until further order of this court, from

(a) picketing at a distance of 12 feet or closer to the windows at the entranceways of the stores operated by plaintiffs (the names of which establishments have been set forth in the body of this opinion);

(b) picketing in proximity to each other closer than 12 feet;

(c) picketing in numbers greater than two per store entrance;

(d) using bullhorns in aid of their dissemination of information;

(e) physically obstructing ingress or egress to or from plaintiffs' establishments, other than by their mere presence at the site, or from threatening, molesting or insulting, or from advising, instruct-

ing, or encouraging others to physically obstruct such ingress or egress or to threaten, molest or insult plaintiffs, their officers, agents or employes or any other persons for their refusal to participate in the picketing or for patronizing or doing business at the stores in question.

2. The security of $500, entered by plaintiffs pursuant to the special injunction order of Hirsh, *J.*, is maintained in effect.

3. May 15, 1974 at 10:00 a.m. in room 1201 Five Penn Center Plaza Building is set as the date and place of hearing of plaintiff's motion for permanent injunctive relief.

## SUPPLEMENTAL OPINION

SPORKIN, *J.*, May 27, 1975—The facts in this case were set forth in the memorandum opinion and decree issued by this court on May 1, 1974, filed pursuant to a rule for preliminary injunction brought by plaintiffs against defendants. On said date, we modified and amended a special injunction order which had previously been issued by Hirsh, *J.* Thereafter, plaintiffs moved to have the preliminary injunction order of May 1, 1974 made permanent. At a hearing before this court, both sides rested upon the testimony presented by them at the preliminary injunction hearing. Upon consideration of the testimony adduced, and of the arguments of counsel, we conclude that the preliminary injunction should be made permanent and that the injunction bond, previously entered by plaintiffs in the sum of $500 be dissolved.

We expressly adopt the findings of fact, discussion and conclusions of law as contained in our memorandum opinion and decree dated May 1, 1974.

Accordingly, we enter the following

## DECREE NISI

1. The preliminary injunction order issued by this court on May 1, 1974, is made permanent, and the rule therefor made absolute.

2. The preliminary injunction security entered by plaintiffs in the sum of $500 shall no longer be required and the bond, therefore, is hereby dissolved.

3. The prothonotary is directed to notify all parties of this decree nisi and if no exceptions are filed pursuant to Pa.R.C.P. 1518, this decree nisi shall be entered by the prothonotary as the final decree in accordance with Pa.R.C.P. 1519.